## WESTERN TWIGGS *et al. vs.* JOHN A. CHEVALLIE *et al.*

### January Term, 1870.

1. Land is granted by the commonwealth to S., in 1788. He sells and conveys it in 1812. It is not on the commissioners book until 1813, when it is entered in the name of the grantees of S., and the taxes paid until 1842. In 1839 it is sold, under a decree of court, by the commissioner of forfeited and delinquent lands in the name of S. HELD:

  I. It was not forfeited under the act of 1835–36, as the alleged forfeiture could only operate on the ownership of S., in whose name it was forfeited, as he then had no interest in it, and it was then actually on the commissioner's book in the name of parties claiming under him, and the taxes duly paid.

  II. That the jurisdiction of the court ordering a sale of the land, was a limited one and only extended to lands that were *actually* forfeited, and was based on the report of the commissioner who was required to report the lands that were delinquent, and none other. Therefore no sale of lands thereunder not actually forfeited, could divest *bona fide* owners.

  III. If, as was claimed; the decree divested the title of the grantees of S., the purchaser only acquired such as was in S., the patentee; in whose name the land had been sold, and he had parted with all title in 1812.

This case came from Harrison county. A sufficient statement of the points at issue appears in the opinion of Berkshire, President.

No counsel appeared for the plaintiffs in error.

*See page 443.

*John S. Hoffman* for the defendants in error.

The commonwealth granted the land, to recover which, the suit was brought, to John Strobia. He died, and it descended on his three children. Two of them conveyed two-thirds of the land to John A. Chevallie and Joseph Gallego. The latter devised one-third to Peter J. Chevallie and John Richard, in trust, for purposes specified. John Richard made a will and died, and one-sixth of the land descended, or was devised, to Caroline Thornton, his niece. Peter J. Chevallie died, and one-sixth of the land descended on his children. John A. Chevallie died, and one-third of the land descended on the same persons, his grand-children. One of them, Sally A. Warwick, the wife of Abraham Warwick, died, her interest descended on her children. Two of the children of John A. Chevallie, successively, died, and their respective interests descended on their brothers and sisters and the children of Sally A. Warwick, who are the plaintiffs in the third count in the declaration. They recovered an undivided half of the land of which the defendants had possession.

Under orders of the circuit court of the city of Richmond, in a case to which Caroline Thornton was a party, a commissioner sold one-twelfth of the land, and conveyed it to Edwin L. Hewett and Joseph Jackson, jr., who are respectively the plaintiffs in the seventh and eighth counts. They each recovered an undivided twelfth part of the land of which the defendants had possession.

The deed from two of Strobia's heirs to Gallego and Chevallie, appears to have been sealed by the third. But she was a married woman, and was not privily examined.

This deed recites that, in the lifetime of Strobia, he conveyed the land to Gallego and Chevallie, by a deed which was not recorded; and it purports to convey the land. If the recital be regarded as true, then, in the lifetime of Strobia, the title to the whole land passed from him to Gallego and Chevallie, and nothing passed by the deed in evi-

dence. If the recital be not regarded as true, then, by the deed, the title to two-thirds of the land passed. The plaintiffs rely primarily on the deed as having the latter effect.

When a deed recites a previous fact, the party claiming under it cannot make the recital evidence of that fact. The opposite party, however, at his option, may treat and rely on it as evidence, or he may not do so. The court must either consider the recital as evidence to prove the fact, or not consider it as such. The recital must be true or not true. When the deed recites that the title to land previously passed to the same party to whom the deed purports to convey it, it is utterly immaterial whether the party who may do so, relies on the recital or not; whether the court considers it or not; whether it be true or not; so far as it affects the question whether the title was transferred. On the one hand the recital proves the fact. On the other, the operative part of the deed accomplishes and proves the same fact.

Gallego supposed that Strobia or his heirs had conveyed the whole of the land to him and Chevallie, that the latter had released one-half to him, and that so he owned the whole. Such release was not, however, proved in the case.

Abraham Warwick, the husband of Sally A. Warwick, survived her, and still lives. Though an interest in the land descended from her father and grand-father upon her, her husband did not enter upon the land, and they were not, during the coverture, seized in deed of the interests which descended on her. He was not, therefore, after her death, tenant by the curtesy.

Seisin in deed, by the husband and wife in right of the wife, during the coverture, is necessary in order that the latter may become tenant by the curtesy, after her death. Co. Litt. 29, a 31 a; Bac. Abr., title, Curtesy of England, Letter C; *Rex.* v. *Inhabitants of Great Farringdon*, 6 Term Rep., 679; *Doe* v. *Rivers*, 7 Term Rep., 277; 1 Lomax's Digest, 64–6. If the subject be of such a character as to admit of actual seizin, even if, in a particular case, the husband

was, by unavoidable accident, prevented from acquiring it, still he is not thereby excused for not doing so. Bac. Abr., *ubi supra.*

Seisin in deed may be either actual or constructive. An entry upon, and occupancy or use of land, under claim of a freehold estate, constitutes actual seisin in deed. The commonwealth's grant of land is regarded as equivalent to an actual tradition of possession by one citizen to another, and confers constructive seisin in deed. *Green* v. *Liter*, 8 Cranch, 229; *Clay* v. *White and others*, 1 Mun., 162; *Bolling* v. *Mayor of Petersburg*, 3 Ran., 563. So, by statutory provision, a deed of bargain and sale, lease and release, or covenant to stand seised to a use, made by a party seised, to another, draws after it the seisin of the former. 27 H., 8, c. 10; 12 Hen. Stat., p. 157, Acts 1785, c. 62; R. C., p. 370, ch. 99, § 31; Code, p. 502, ch. 117, § 14. A descent from an ancestor to an heir, however, does not confer on the latter such constructive seisin in deed. This confers but a seisin in law. Co. Litt., *ubi supra;* 1 Lomax's Di., 4–5.

In England, without actual seisin during the coverture— without other seisin than such as was conferred by a descent —a husband could not be tenant by the curtesy. This was the common law. Authorities before cited. The convention of Virginia, in 1776, ordained that the common law, so far as the same might consist with the ordinances, declarations and resolutions of the convention, should be the rule of decision, and should be in full force, until the same should be altered by the legislative power. 11 Hen. Stat., p. 127, ch. 5, § 6. The principle of the common law, just stated, did then, and does still consist with these ordinances, declarations and resolutions, and so was then ordained to be in full force. The general assembly again and again recognized and re-enacted this ordinance. 13 Hen. Stat., p. 23, Acts 1789, ch. 17, § 1; 1 R. C., p. 135, ch. 38, p. 137, ch. 40, § 1; Code, p. 93, ch. 16, § 1. The principle of the common law in question, has not been altered by the legislative power. Then, it is still the law of Virginia.

In some of the States, the subject has been acted on, and the common law has been adhered to. *Jackson* v. *Johnson*, 5 Cow., 74; *Den* v. *Dervorest*, 1 New Jersey, 525; *Adams* v. *Logan*, 6 Mon., 176; *Orr* v. *Holliday*, 9 B. Mon., 59; *Neely* v. *Butler*, 10 B. Mon., 48; *Stenebaugh* v. *Wisdon*, 13 B. Mon., 467; *Petty* v. *Malier*, 15 B. Mon., 591.

The supreme court of the United States lately held, that at the common law, seisin in deed by the husband and wife during the coverture, was necessary in order to his tenancy after her death, and that in Virginia, it was still necessary. *Mercer's lessee* v. *Selden*, 1 How., 37. In the case decided, there was actual possession in a stranger, adverse to that of the husband and wife. But, surely, if the husband be not excused from making an entry where there is actual adverse possession, he will not be excused when that difficulty is not in his way.

That court once held that in Kentucky, at an early period, it was next to impossible for a husband to take possession of lands in the wilderness parts of that State, and that an entry by him for that purpose, was not necessary. *Davis* v. *Mason*, 1 Peters, 503. It is supposed, however, that if the common law had been adopted in Kentucky by as high authority, as absolutely, and with as few exceptions, as in Virginia, and its adoption had been brought to the attention of the court, the principle in question, so firmly established as a part of that law, determining the title to real estate, would not have been repudiated. That decision of the supreme court has not, however, been regarded as furnishing the law in Kentucky. On the contrary, the court of appeals of that State, has adhered to the principle, that a descent does not confer a seisin sufficient, with the other requisites, to make a tenant by the curtesy.

The common law rule in question has not heretofore been abrogated in Virginia. Will this court now abrogate it and adopt a different one? The reason suggested by the supreme court, for a change of the rule in Kentucky, as applicable to land in wilderness parts of that country at an early day, does

not prevail in Virginia at this day, so as to require a change of the general rule here. England was much less improved when the rule in question was adopted, and for centuries afterwards, than Virginia now is. Few of the impediments that formerly obstructed the exercise of a legal right in that country, oppose it in this. Indeed, generally, not only is there not such an impossibility as to excuse the husband from entering on the wife's land, but there is not an inconvenience in making such an entry, that does not attend as much action directed to any other purpose.

The supreme court, in the case already mentioned, suggests, that if land be native forest in an uninhabited region, that is a reason why the husband should be excused from entering on the land during the life of the wife, and should, notwithstanding his failure to do so, have an estate for his life. Is it not a much stronger reason why, if he does not enter, he shall not have the estate?

If the land be so "wild" and so remote from the abode of men, that it would be seriously inconvenient for the husband, during the life of the wife, to enter upon it, he would not probably, after her death, desire to remove the forest and otherwise improve the land so as to make it valuable for purposes of cultivation. He would, therefore, lose nothing by being deprived of the estate. But in the less improved parts of the country, it is vitally important to its settlement and development, that the owner, whoever he be, should be brought into contact with the land, and should improve it himself, or make known to those who would do so, that there is an owner other than the commonwealth, and who he is, and afford them an opportunity to acquire the title and improve and cultivate the land. If the husband enter on the land, this end will be, at least in part, and probably in the whole, attained. If he do not, the land should descend directly upon the heirs, who may then at once improve and cultivate it, or transfer it to others who will do so.

Whether, indeed, the land be wild or subdued—remote

from cultivation or in its midst—it is equally important to the development of the resources of the country, and the promotion of plenty and prosperity, that the soil should be improved and cultivated. A rule, therefore, which conduces to this, is wise and beneficial, and should be adhered to.

If, without an entry by the husband in the lifetime of the wife, his tenancy be complete,—when an adverse claimant takes possession after her death, during his life, the immediate right of possession not being in the heirs of the wife, the time within which they may bring their action for the recovery of the land, does not commence until after the death of the husband. It continues from that event for the time prescribed by the statute. Though neither the husband nor the heirs have, ever in any manner, indicated their claim, but both have all the time allowed the occupant to improve the land, and regulate his affairs in the delusive belief that it was his, the heirs may, notwithstanding, on the last day of the last period, bring their suit, in which they will recover the land. Thus, to secure to a surviving husband, without his compliance with a wholesome requisite of the law, a title to an estate for life, which he would not enforce, a settler, who probably had wasted the vigor of his manhood in the acquisition and improvement of a homestead for himself and those for whom it was appointed that he should provide—deprived of the protection which the statutes of limitations ordinarily affords—would, perhaps, when age had impaired his energy, be driven from the field of his labor, and the home of his adoption.

In a very large section of the State, in which the uncertainty and confusion of the land-titles baffles the investigation and defies the ingenuity of the most assiduous and astute, that possession under claim of title, continued for the requisite time, which by the statute of limitations bars a recovery, and consequently matures the claim into an absolute title, is the sole protection upon which the uninformed settler may implicitly rely. An innovation which would undermine this only solid ground upon which such may

securely stand, unless it were imperatively demanded by some cardinal principle of justice, should not be incorporated into the jurisprudence of the country.

The circuit court of the city of Richmond, directed its commissioner to sell and convey the whole land granted to Strobia, and he professed to do so. But the only persons owning any part of the land, or connected with any such person, who were parties to the suit, were Philip Thornton and Caroline A. Thornton, his wife, and John M. Ferguson, administrator *de bonis non*, with the will annexed of Joseph Gallego, and administrator *de bonis non*, of Peter J. Chevallie. Mrs. Thornton owned legally one-sixth of the land—the other parties none. The proceeding of the court and the action of its commissioner could pass only such part of the land as was owned by a party to the suit. *Hudgins* v. *Hudgins' ex'r et al.*, 6 Gratt., 320.

The commissioner of delinquent and forfeited lands for the county of Harrison, on the 16th day of July, 1839, reported to the judge of the circuit superior court of law and chancery for the county, that the land had been patented to Strobia, and that he did not find that it had been conveyed from him by a deed recorded in that county, and that he had examined the commissioner's books and did not find that the land had been taxed. The judge, on the same day, ordered that the "*superintendent*" make sale of the land. The commissioner, on the 21st day of October, 1839, sold the land to Joseph Weirick. The court, on the 9th day of November, in the same year, confirmed the sale. The commissioner, on the 26th day of October, 1840, made a deed for the conveyance of the land to Weirick.

The commissioner not having discovered the conveyance from the heirs of Stobia to Gallego and Chevallie, recorded in the general court, he examined, it is presumed, only in the name of Strobia, to find the land entered on the commissioner's books charged with taxes. He did not examine in the name of Gallego and Chevallie. He did not, in his report, mention, or allude to the heirs of Chevallie and the

heirs of the devisees of Gallego. Neither the commissioner, nor the judge in vacation, nor the court in term, stated or expressly adjudged that the land was forfeited.

The land, in the year in which the conveyance from Strobia's heirs to Gallego and Chevallie was certified by the clerk to the commissioner, was regularly entered on the land-book of the commissioner of the revenue for the county of Harrison, in the name of Joseph Gallego, who, as it appears by the evidence, owned an undivided half, and claimed the whole of the land, and was kept on the books in his name—though the abreviation of his christian name was somewhat corrupted in spelling—continually until the year 1843, when, as the law required, it was placed at the back of the book; and the taxes for all these years, except the year, 1830, were paid, and the tax for that year, being less than 10 dollars, was released. Even if the commissioner's report proved that the land had been omitted from the books of the commissioner of the revenue previous to the year 1813, the land was not forfeited.

Land that was on the commissioner's book in the year 1834, is not of that class of lands which never were, or had not been for many years then last past, entered on the books of the commissioners of the revenue where they respectively lay. Land on the books in the name of one of several co-tenants, is not within the class which had not been entered on the books for such years. Though the name of the owner, or one of several owners of land, be misspelled on the commissioner's book, still if the entry, construed with reference to the title-papers and previous entries on the books, and other circumstances, indicate the person intended, it should be treated as a sufficient entry in the name of such person. Land on the book of the commissioner of the county in which it lay, in the year 1834, in the name of one co-tenant, though his name was not properly spelled, was not, even if it had not been entered on the books for any previous years, forfeited for such omission. Acts 1835-6, p. 12, § 2; *Lohr v. Miller's lessee,* 12 Gratt., 452.

An entry on the books of the commissioner of the revenue, or a payment of taxes, which will prevent a forfeiture, is a very different thing from such an entry and payment, as, when the land has already been completely forfeited and vested in the commonwealth, will redeem it, or in any manner occasion a transfer of the title from the commonwealth to the party making the payment. The former is in the nature of a condition subsequent, which will be liberally construed to prevent a forfeiture; the latter in the nature of a condition precedent, which will be more strictly construed in order to the acquisition of a title.

The legislature directed that the commissioners of delinquent and forfeited lands should ascertain the forfeited lands in the several counties, and report them to the circuit superior courts of law and chancery; and that upon the returns, it should be the duty of the courts to direct the commisioners to make sales of the lands. Acts 1836–7, p. 10, ch. 8, §§ 3, 4. The fact of forfeiture, which should be the foundation of the action of the court, was submitted to the investigation and determination of the commissioner who was appointed to ascertain and report the fact to the court. By the terms of the law, that fact was not submitted to the inquiry or judgment of the court or judge. But though that was not expressly done, the province to consider the question of forfeiture, and decide it, so far as such decision might determine the action of the court, subject to such future inquiry and consideration as are necessary for the protection of the rights of citizens, it is supposed, is implied in the nature of the subject, the character of the proceeding, and other provisions of the statutes on the subject. No power, however, is implied, to decide that question, without such qualification as justice and good policy demand. A function, to be exercised under circumstances that of necessity preclude the possibility of a complete development of the material facts, or an enlightened consideration of the subject, so inexorably, as, without any cause whatever, to confiscate the real estate of a person and transfer it to a stranger, and deny

to the owner the opportunity to show that the estate was his and there was no cause for the confiscation, should not, without an express legislative grant, be attributed to any court.

Though a court or judge has declared land to be forfeited, and directed it to be sold, and this has been done, yet, if in fact, the land was not forfeited, the proceeding does not affect the title of the owner, or confer any title upon the purchaser.  Land not forfeited, is not liable to the inquiry, adjudication or disposition of the court.  Only forfeited land is subject to this extraordinary statutory jurisdiction. If the land be not forfeited, the court has no jurisdiction over it, and the proceeding is *coram non judice,* and has no efficacy whatever.

When facts appear upon the record, that constitute or indicate a forfeiture, or when, though they do not appear, the court has expressly or impliedly adjudged that the land is forfeited, either the claimant under the proceeding to sustain it, must prove the apparent or implied facts to be true, or he who would question the proceeding, may disprove such facts, or prove others to counteract their effect.

In making title under such proceeding, it should, it is suggested, be first shown by independent evidence that the land was forfeited, and was a proper subject for the action of the court; and then, that the court did act.  Land once granted by the commonwealth, remains the property of the individual owner until it becomes forfeited, or is otherwise transferred to the commonwealth.  When it appears to have been vested in one person, it must be presumed to remain in him, until it is shown to have passed from him. A judicial proceeding, to which he is not a party, would not have that effect; and the record of the proceeding would not be competent to prove this fact.  In such case, the court acts through the party to the suit, who owns the land, upon the land itself.  But, in order to sustain the action of the court, it is necessary to show, by extrinsic evidence, that the land was owned by a party to the suit.  Without this,

the court would have no power over the subject, and a decree for the sale of the land, or a transfer of the title, would be ineffectual for the purpose. When the forfeiture is shown, it thereby appears that the land became the property of the commonwealth, and that, under the enactments of the legislature, it was subject to the disposition of the court. But unless there be such forfeiture, the court has no power over the land.

It was natural, as well as reasonable, that the legislature should adopt, as far as applicable, the existing law relative to judicial sales; and not only an express provision, [Acts 1836-7, p. 10, ch. 8, § 4], but the entire structure of the acts on this subject, manifests the intention to do so. *Smith et al.* v. *Chapman,* 10 Gratt., 445, see 465; *Hitchcox* v. *Rawson,* 14 Gratt., 526. It cannot be supposed that it was the purpose of the makers of the law, to adopt as a canon of real estate, the doctrines of the civil law relative to proceedings *in rem.* Though admiralty courts, perhaps necessarily, and not unjustly when the property is in the actual possession of the officers of the law, have applied the doctrine of final condemnation of the subject, to personal property; yet such a doctrine is entirely alien to the principles of common law, and totally unsuited to the character of real estate. In the former case, the seizure of the property generally occasions actual notice to the owner, and serves the purpose of process; but in the latter, there is no such substitute. *Hollingsworth* v. *Barbour,* 4 Pet., 466, see 474.

In the proceeding under consideration, the owner of the land when it is not forfeited, has no notice, no opportunity to disprove the facts reported by the commissioner, or otherwise assumed, or to prove others to avoid their effect, cannot be heard as to the law, and has no appeal from the decision. In ordinary cases between parties, the defendant may do any of these things; and if he voluntarily submits to the jurisdiction, or abides the decision of the court, that facts necessary to sustain it, exist, he may not perhaps, when he has waived these simple and adequate safeguards,

afterwards collaterally question the adjudication. When, however, the proceeding is *ex parte*, the only protection afforded to the person to be affected, against error of fact or law, is to subject the adjudication to the subsequent inquiry, whether the facts support it, and if they do not, to hold it void.

The facts affecting the title to land, are, as has already been noticed, generally the most complicated, and the determination of the law arising on them, the most difficult of construction, known in practice. It cannot be supposed that in many cases, the commissioners would collect all such facts, or that the court, without the aid of counsel, would always pronounce a very satisfactory judgment, even on the facts before it. It certainly was not intended, that such a one-sided proceeding and adjudication should conclude all questions of fact and law, affecting the forfeiture of land. Were this so, the best land title would be but the sport of a judicial formality.

A proceeding in which the land is treated as having been the property of a person, and it is declared delinquent, or not entered on the commissioner's books in his name, might probably be regarded as in some sense a proceeding against him as a *quasi* party. If so, yet where it appears that the land is not owned by such person, but by another, the adjudication will not affect the title of the latter, who was in no sense a party. A proceeding in which there is no mention made of the owner of the land, or allusion to his title, cannot well be regarded as against *him* or *his* land. It were strange, indeed, if it were considered valid against him, or in any way effectual to transfer his title to another. Even, then, if it be not necessary for the purchaser to show that the land was delinquent or omitted from the commissioner's books, and forfeited, the adverse claimant may show, affirmatively, that the land was not owned by the person supposed, and thus avoid any presumption arising from a delinquency or non-entry in the name of the person erroneously assumed to be the owner, and manifest that the fact considered by

the court was not that on which the forfeiture turned, and that the latter fact was not adjudicated, and does not exist. Surely, an adjudication of one immaterial fact, is not in any case conclusive as to the existence of another material fact.

An adjudication of a fact, in one case, is not evidence of the fact, in another case, against persons not parties to the former, or in privity with them. *Payne* v. *Coles*, 1 Mun., 373; *Chapmans* v. *Chapman*, 1 Mun., 398; *Mason's devisee* v. *Peters' adm'rs*, 1 Mun., 437; *Pleasants* v. *Clemens*, 2 Leigh, 649, see 650.

An adjudication between a creditor and an executor, that a debt was due from the testator, is not evidence of the fact against the devisees. *Mason's dev.* v. *Peters' adm'rs*, 1 Mun., 437; *Shields' adm'r* v. *Anderson's adm'r, &c.*, 3 Leigh, 729, see 736.

An adjudication in one case that a party is the heir of a former owner of land, and decree that he convey the title descended from such owner upon him, is not in a subsequent case against a stranger, ever *prima facie* evidence that the party previously adjudged to be such heir, was such. *Lovell* v. *Arnold*, 2 Munford, 187; *Duncan* v. *Helms et al.*, 8 Gratt., 68.

A testator, by his will, charged his land with the payment of his debts. In a suit, between a creditor of the testator and the executor of the will, to which the devisees were not parties, the court adjudged that the debt was due, and decreed that the land should be sold by commissioners, and it was done, and the sale confimed and a deed was made. In a subsequent case, the court of appeals held that, though the debt was a charge upon the land, the decree, sale and conveyance, were inoperative. *Hudgin* v. *Hudgin's ex. et al.*, 6 Gratt., 320. See also 6 Leigh, 435.

An adjudication in one case, between parties, cannot be used in a subsequent case, by a stranger to the former, even against a party to it. *Payne* v. *Coles*, 1 Mun., 373.

In a suit by a creditor against a debter, trustee and bene-

ficiary in a deed, the court adjudged that the deed was fraudulent and void in part, and decreed accordingly. In a subsequent case, by another creditor against the same defendants, the creditor relied on the record of the previous case, as establishing the fraud and partial invalidity of the deed. This court held that the record could not be used for that purpose.    *Winston* v. *Starke and others,* 12 Gratt., 317.

A court of chancery cannot, by its decree, without a conveyance, transfer a title from a former to a substituted trustee; and in a suit against the latter trustee, to which the former is not a party, the court cannot make any decree which will, either immediately or through the instrumenality of a conveyance, affect the title.. *Greenleaf* v. *Queen et al.,* . Pet., 138; *Williamson* v. *Berry,* 8 How., 534.

A judgment against a person who has not notice of the proceeding in which it is rendered, is void.    *Moss, &c.* v. *Moss, &c.,* 4 H. & M., see 307–8.; *Hollingsworth* v. *Barbour t al.,* 4 Pet., 466; *Boswell's lessee* v. *Otis,* 9 How., 336, see 50; *Kilburn* v. *Woodsworth,* 5 Johns., 37, see 41.

When a statute confers on a court power, to be exercised *x parte* over a subject, upon the existence of certain facts, he action of the court, if the facts do not exist, is void. *McClung* v. *Ross,* 5 Wheat, 116;. *Thatcher* v. *Powell,* 6 Wheat, 119; *Bennett* v. *Higgins,* 4 Dana; *Griffith* v. *Dickens,* Dana.

When a court transcends its jurisdiction, its unauthorized ecree is void.    *Shriver's lessee* v. *Lynn,* 2 Howard, 43; *Wilamson* v. *Berry,* 8 Howard, 498, see 452; *Hickey's lessee* v. *tewart,* 3 Howard, 750, see 762; *Boswell's lessee* v. *Otis,* 9 Ioward, 236; *Pleasants* v. *Clemens,* 2 Leigh, 474, see 482; *hackelford* v. *Hunt,* 4 B. Monroe, 263; *Madeira's heirs* v. *Topkins,* 12 B. Monroe, 602; *Maude* v. *Rhodes,* 4 Dana, 147.

A statute authorized, under certain circumstances, a suit, pon publication, against unknown heirs. A court having risdiction of such cases, considered that the facts upon hich the proceeding might be had, existed; and by its ecree directed a conveyance in behalf of the heirs to the

complainant. In a subsequent case, it was held that the supposed facts did not exist, that the court had not jurisdiction of the subject matter, and that the decree was void, and the conveyance under it conferred no title on the purchaser, even as against a stranger. *Hollingsworth* v. *Barbour*, 4 Peters, 466.

A court, by a decree, directed a trustee to sell land. He sold land not within the scope of the decree, and reported it, and the court confirmed the sale. In an action of ejectment, it was held that the decree of confirmation was void. *Shriver's lessee* v. *Lynn*, 2 How., 43. In this case, (p. 60.), Mr. Justice McLean said: "There was no case before the court; nothing on which its judgment could rest. No court, however great may be its dignity, can arrogate to itself the power of disposing of real estate, without the forms of law. It must obtain jurisdiction of the thing in a legal mode. A decree without notice would be treated as a nullity."

A court of common pleas ordered an administrator to sell land of his intestate, and he did so. The court had no authority to direct a sale. This order was held void, and the sale a nullity. *Bank of Hamilton* v. *Dudley's lessee*, 2 Peters, 492, see 522–3. A circuit superior court had no more authority to direct a sale of land not forfeited,—and when it did so, the sale had no greater validity.

The legislature provided that deeds for the conveyance of lands might be acknowledged by the parties who had sealed and delivered them, or be proved by three witnesses to be their acts, before the general court, or the district court, or the county court, for the district or county in which the lands lay; or, that if the parties resided not in such district or county, the deed might be acknowledged or proved by the like number of witnesses to have been sealed and delivered, before a court of law, or other officer mentioned, of the county in which the parties should dwell, in a manner specified, and might be offered to the general court, or such district or county court, to be recorded, within a time pre-

scribed; and that the clerk should record such deeds. 12 Hen. Stat., p. 154–5, Acts 1785, ch. 62, § 1; Shep. Stat., p. 84–6, 28, s. s. 1, 4, 5, 8; 12 Hen. Stat., p. 537, Acts 1788, s. 6; 13 *Idem.*, p. 425, Acts 1792, c. 13, § 9, p. 431, c. 14, § 6.

These courts were of record, some of them having the highest and some the most general original jurisdiction. When the proceeding was entirely in the general court, or a district or county court to which the deed was offered to be recorded, it was the duty of the court, upon an acknowledgment, to ascertain whether the party who acknowledged the writing, was the same person who had signed and sealed it; or upon proof, to ascertain, by the testimony of three witnesses, whether the writing was the act of the party. When the proceeding was in part before another court of law or officer, it was its duty to ascertain the same facts, and the duty of the court to which the deed was offered to be recorded, to ascertain whether these facts appeared by the certificate, whether the acknowlegment was before the proper court or officer of the proper county or place, whether it was certified properly, and whether the deed was offered to the court to be recorded within the time prescribed. If the latter court decided these questions in the affirmative, it adjudged that the deed was proved; and thereupon it was the duty of the clerk to record it. Yet, it has always been held, that the judgment of the court that the deed was proven or acknowledged, whether declared in terms or implied in an order to record the deed, is not conclusive, either that the deed was sealed and delivered at all, or that it was proven or acknowledged and offered to be recorded, within the time prescribed after the sealing and delivery. *Maxwell* v. *Light*, 1 Call, 116; *Moore's ex.* v. *The Auditor*, 3 H. & M., 232; *Jennings and others* v. *The Attorney General*, 4 H. & M., 424; *Harvey* v. *Alexander and others*, 1 Ran., 219; *Heron* v. *Bank U. S.*, 5 Ran., 426; *Horseley and others* v. *Garth and others*, 2 Gratt., 471; *Shanks* v. *Lancaster*, 5 Gratt., 110; *Glazebrook's adm'r* v. *Ragland's adm'r*, 8 Gratt., 332; *Hodgson* v. *Butts*, 3 Cranch, 140.

Formerly these were perhaps called ministerial acts. Of late they have been called by a different name. The evidence tending to the probate and recordation of a deed, was submitted to a judicial court—not to the clerk, its ministerial officer. The court heard ǀthe evidence, decided upon its sufficiency, and pronounced and caused to be recorded its judgment. Upon this judgment, the ministerial officer of the court manually recorded the deed. The name by which the proceeding is called, does not change the nature of the preliminary inquiry, or the character of the judgment of probate.

The facts to be ascertained are generally simpler, and the law upon them less difficult of construction, in the proceeding to declare a deed proven and record it, than in the proceeding to declare land forfeited and sell it. If the *ex parte* proceeding be not conclusive in the simpler class of cases, it certainly ought not to be so treated in the more complicated class, in which there is the greater probability of imperfect information or judicial error.

The supreme court of the United States has sometimes, as this court has lately, held that when under a statute a court had general jurisdiction of a subject, to be exercised in cases between parties, who have notice, may adduce evidence, be heard in argument, and appeal, though the facts which would authorize a judgment do not exist, yet, if the court has decided that they do exist, and accordingly given judgment, the remedy of the party aggrieved is to appeal, and that having failed to do so, he may not, in a subsequent suit, treat the judgment as void. *Grignon's lessee* v. *Astor*, 2 How., 319; *Sargeant* v. *State Bank of Indiana*, 12 How., 378; *Cox* v. *Thomas' adm'r*, 9 Gratt., 323.

This court has also decided, that an adjudication relative to the probate of a will or the grant of administration, by a court having general jurisdiction over the subject, not appealed from, or, by some proceeding for the purpose, vacated or otherwise annulled, cannot be treated as absolutely void. In all such cases, however, in which the

adjudication may not, in a new proceeding, be reviewed, some person representing the interest of all who have any interest, is a party; all *may become* parties, and may adduce evidence, have counsel, and, if aggrieved, appeal to a higher court.

The principles of the civil and canon law formerly regulated the proceedings, and determined the effect of sentences relative to the probate of wills of personal estate and grant of administration in the Ecclesiastical courts, where alone these matters were cognizable. When jurisdiction of these subjects was conferred on the common law courts, that jurisprudence which had before prevailed in the Ecclesiastical courts, was applied to the same subjects, in the new forums to which they were committed. Indeed, as by statutory enactments, the influence of probate and administration is extended, so as, more or less, directly or indirectly, to affect the title to real estate, the same principle may, to a greater or less extent, be applied to this new subject. No such principles, however, except in the effect of the probate and order to record a will, have as yet, to any considerable extent, if at all, been applied to real estate in Virginia.

If there is a statutory proceeding known to the law of Virginia, that resembles the proceeding *in rem* of the civil and canon law courts, and especially the probate of a will, it is the proceeding and judgment of probate *upon a deed,* when the court hears the evidence, adjudges that the deed is proven, and directs it to be recorded. Yet, as has been observed, uninfluenced by the principles that control and determine the effect of the judgments of the Ecclesiastical courts, governed by the principles of the common law, which give effect to judgments against those only who were parties to the proceedings in which they were pronounced, our courts have adopted a rule as to the effect of the probate of a deed, the direct opposite of that which prevails as to the effect of the probate of a will.

The civil and canon law furnished, also, principally, the jurisprudence of the admiralty courts. Hence principles

similar to those applied to probates of wills of personalty and administration, were adopted in proceedings to condemn property seized upon sea, and perhaps other subjects of admiralty jurisdiction; and the like conclusive effect was given to judgments in such cases.

The spirit of these laws, it would seem, differed widely from that of the common law, in the importance attached to actual notice to persons who might be affected by the sentences or judgments of courts, and the opportunity to make defense.

It is believed that proceedings *in rem*, except those borrowed from the civil and canon law, are not known to the law of Virginia. Indeed it is said by a learned and distinguished jurist, that courts of common law do not proceed *in rem*, and cannot directly reach a thing *in specie*. At any rate, it is confidently suggested, that a proceeding *against real estate*, whereby, without notice to the owner, or an opportunity to make defense, or to appeal, the land of a citizen, who has committed no fault, neglected no duty, incurred no liability which he has not discharged, may be erroneously condemned and transferred to a stranger, and the owner precluded from subsequently showing the error, has never been authorized by the legislature or sanctioned by the courts of Virginia.

Upon principles of justice and the authorities, then, an order that land *not* in fact forfeited, should be sold *as* forfeited, made previous to the 13th day of February, 1844, was void, and unquestionably had no validity, down to that time. An act of assembly was then passed, (Acts of 1843–4, p. 19, ch. 19, sec. 1), which it has been argued, in effect, gave to such void order complete validity, and imparted to the sale and conveyance made under it, the efficacy of a perfect transfer of the title of the owner of the land, from him to the purchaser at the judicial sale. An act of a subsequent legislature cannot indicate the intention of a former one in a previous act, or control the effect of that act, otherwise than by legislation directly repealing

or altering it. The construction, then, of the acts of 1837 and 1838, providing for the sales, and the effect of the sales made before the act of 1844, from the time they were made until the passage of that act, is not influenced by it. There are no proper words in the latter act, to give validity to previous sales. A construction which would give to it that effect, would attribute to it not only the characteristics of ordinary injustice, but the extraordinary odiousness of retrospective legislation. The act provided that the owner of land sold, might file a petition for redress against an improper sale; but that it should not be done after the expiration of three years from the time when the sale was made. A large number, perhaps most of the sales of this character, were made before the first day of March, 1841. The act did not take effect until the 1st day of March, 1844. If the remedy thereby given was exclusive of the pre-existing right to question the validity of the proceeding, on general principles, and so, in effect, gave efficacy to the forms of judicial transfers theretofore void,—it capriciously and relentlessly set the seal of condemnation on all titles to lands sold before 1841, no matter how perfect such titles, or how meritorious the owners might be. These owners, whose lands had been improperly sold, were, without the pretense of a reason suddenly deprived of redress or protection. Either, then, the enlightened legislators of the people of Virginia intended, in mere wantonness, to obliterate the pre-existing rights of many of her citizens, and at the same time mock them with the mere unsubstantial semblance of an adequate remedy; or they intended that the redress given by the act in question, should be cumulative upon the right to question the validity of the sale, whenever there was an attempt to enforce it. In this alternative, the latter purpose will be unhesitatingly ascribed to the legislature.

The act provides, that, by the petition, the legality or justice of the sale, or order directing it, as distinguished from the fact that the land was not subject to sale, may be questioned. The legislature might very properly require,

484        COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,        Twiggs et al. vs. Chevallie et al.        1871.

that those objections to the sale should be made in that form, within a specified time; while the question as to the forfeiture of the land—going to the very right of the case and the power of the court over the subject,—should be left, as before, to the general principles of the law,—by which, if the land was not forfeited, the proceeding would be without judicial sanction, and the sale a nullity.

When land *not in fact* forfeited, was declared forfeited in the name of one who then owned it, and might, therefore, perhaps, be treated as, in a sense, a party to the proceeding, and as having a kind of constructive notice, the sale may not have been regarded as absolutely void; and the petition authorized by the act of 1844, may have been intended to give the owner the opportunity to avoid it; while, when the land was declared forfeited in the name of *another*, the *name* of the *owner* did not appear in the proceeding, he was not in any sense a party, and had not even constructive notice; the sale would be absolutely void, there would be no necessity for the act of 1844, to protect such owner, and it would not perhaps be applicable to such a case.

The provision on this subject, now in the statute-book, is totally unmeaning and absolutely idle. By an act of March, 1846, it was provided that the courts should not, after the fall terms of that year, make orders for the sale of delinquent lands. Under this act, the last sales would take place in that fall, or the ensuing winter. Yet the provision authorizing a petition contesting the legality or justice of the sale, and the *limitation* within three years from the time of the sale, were transferred from the act of 1844, to the Code, which did not take effect until July, 1850; more than three years after the last sales were made.

There is nothing in the case of *Smith et al.* v. *Chapman*, 10 Gratt., 445, at variance with the positions that have been here taken. In that case, the only question relative to the proceeding, which was considered, was its *irregularity*. Judge Lee compared it to an ordinary judical sale, and held (p. 445) that it was "in the nature of a *judicial* proceeding"—not a

proceeding *in rem*,—and that those claiming under it, "could not be called on to show its *regularity*." pp. 464–5. The facts, however, necessary to give the court jurisdiction, must exist, in order to impart to its action, *that judicial character*, which precludes a subsequent summary inquiry as to its *formality*.

BERKSHIRE, *President*.

This was an action of ejectment for a tract of land of 500 acres in Harrison county, granted by the commonwealth of Virginia to John Strobia, on the 14th day of March, 1788.

The defendants in error who were the plaintiffs below, claim the land in controversy as derivative purchasers from Joseph H. Gallego and John A. Chevallie, who were the vendees of the heirs of the patentee, John Strobia. Their deed bears date in October, 1812, and was recorded in the general court in November following.

The plaintiffs in error, who are derivative purchasers from Joseph Weirick, who purchased the land at the sales made by the commissioner of forfeited and delinquent lands for Harrison county, on the 21st of October, 1839; and claim, 1st, That the land was forfeited for non-entry under the act of the 27th of February, 1835, and the act of 1836; and, 2d, That whether actually forfeited or not, the record and decree of the circuit court of Harrison county, under which the said commissioner made the sale, are conclusive (as to the question of forfeiture) against the defendants in error and all other persons.

On the trial the defendants tendered a demurrer to the evidence, in which the plaintiffs joined, and judgment was rendered on the demurrer for the plaintiffs.

It appears from the report of said commissioner, made to the circuit court of Harrison county, that the tract now in controversy was never on the commissioner's books of that county in the name of the grantee, Strobia, and that no conveyance of the land, by him, could be found on record in said county; and that the land was therefore for-

feited. Upon this report the court ordered the said commissioner to make sale of the land, which was accordingly done, and the sale (to Weirick) confirmed by a subsequent decree, and the land was afterwards conveyed by the commissioner aforesaid to the purchaser.

But it also further appears from the certificates of the auditor, which are in evidence in the cause, that this tract of land was on the commissioner's books of Harrison county, in the name of Joseph H. Gallego, and charged with the taxes for the years 1813 to 1842, inclusive, and that these taxes were fully paid.

The act of the 9th of February, 1814, repealed all the laws then in force forfeiting lands for the failure of the owners to have them properly entered on the commissioner's books and charged with taxes assessed against them, and remitted all previous forfeitures; and no law was enacted forfeiting lands for such omission until the act of the 27th of February, 1835.

It does not appear that the tract in question was ever on the commissioner's books of Harrison county, and charged with taxes, from the time it was granted to Strobia, in 1788, until 1813, a period of twenty-five years, and it is therefore claimed by the plaintiffs in error that it was forfeited under the acts of 1835 and 1836, before cited. The land in question could not have been forfeited in 1839, when it was so returned to the court by the commissioners and ordered to be sold, either as the land of John Strobia or his heirs; because while they were the owners from 1788 to 1812, it was conveyed in the latter year by the heirs to Gallego and Chevallie, and from 1813 to 1842, as we have seen it was on the commissioner's books of Harrison county, (where the land lay) in the name of Gallego, and the taxes for those years all paid. At most the alleged forfeiture, for which the land was sold by the commissioner, could only operate on the ownership of Strobia, in whose name it was forfeited, and as he then had no interest in it whatever, and the land being at the time on the books in the name of

a person claiming under him, and the taxes duly paid, there was no forfeiture that could effect the true owners. *John* v. *Miller's lessee*, 12 Grat., 455.

It is also very clear that no forfeiture as to Gallego and Chevallie could occur under the act of 1835, as the land was then on the commissioner's books and had been for twenty-two years previous. That act did not purport to forfeit the lands of owners whose lands were *then* on the commissioner's books, but only such as were not *then* on the books and had not been for many years theretofore.

The other objection we are to consider is the effect of the decree and proceedings of the circuit court upon which the sale, under which the plaintiffs in error claim, was made by the commissioner.

It is insisted that as the acts of the legislature conferred jurisdiction on the court to decree sales of lands, reported as forfeited by the commissioner, it was not competent for the owner whose lands have been sold as forfeited, upon such report, to question the correctness of the decree, or to show in this collateral proceeding that the land was not, in fact, forfeited at the time of such sale; and that such decree is *conclusive* as to the *fact* of forfeiture, and consequently bound the interests and rights of all persons whether parties to these proceedings or not. This position, it seems to me, cannot be maintained, and is wholly untenable.

We are not called on in this case to consider what effect the record of these proceedings might have had on the rights of the grantee, John Strobia, and his heirs, in any claim *they* might have asserted to the land. It may be conceded that in such a case the purchaser, Weirick, and those claiming under him, would not be required to show the *regularity* of the proceedings under which the sale was made, according to the authority of the case of *Smith and others* v. *Chapman*, 10 Grat., 445.

But the vital inquiry is, did the decree and proceedings have the effect to divest the rights and title of Gallego and Chevallie, then the rightful owners of the land in question?

If they did, then the judgment complained of is erroneous. But if they did not have that effect, it is clearly right. Now, the jurisdiction of the court in the premises, it may be observed, was a limited and special jurisdiction, conferred by the statute over a particular subject, namely, lands that were actually forfeited. It did not extend to lands not forfeited. The action of the court in such cases is founded on the report of the commissioner, who was required to report the lands that were delinquent and forfeited, and *none other*. If, therefore, the construction contended for was to prevail, it is evident the titles to land, in many instances, would rest on no better foundation than the *opinion* of the commissioner of forfeited and delinquent lands. Such a construction would afford no protection to the citizen, and would tend to unsettle many of the land titles of the country otherwise perfectly good; and to so hold, it seems to me, would be to the last degree, harsh and unwarranted, by any principle of law or justice.

If, as claimed, the decree and proceedings in this case had the effect to divest the title out of Gallego and Chevallie, the real owners at the time of the sale, it is pertinent to inquire in whom did such title vest? Certainly not in Weirick, the purchaser, for he acquired only such title and estate as was in the patentee, Strobia, in whose name the land was forfeited and sold. And as we have seen that neither he nor his heirs had any title whatever, the latter having conveyed the land to Gallego and Chevallie in 1812, is clear that Weirick acquired no title under such purchase. *Smith* v. *Lewis*, 2 W. Va. Rep., 39.

I think it clear, therefore, that the title of the *bona fide* owners of the land in question was not so divested, or in any wise affected by the decree and proceedings under which the sale was made to Weirick, and that such sale, as to Gallego and Chevallie, was a nullity. If this be not so, then the remarkable anomaly in the law must follow, viz: that the right and title of the *bona fide* owners of land, who were in no wise in default, were divested and destroyed be-

yond remedy by a decree and proceedings, to which such owners were *no parties*, and consequently had no notice, and they actually defeated by a party claiming under such proceedings and decree, and yet acquired thereby *no title* whatever! A construction so obviously absurd and unjust, it seems to me, ought not to be adopted and declared to be law.

My conclusion on the whole case, therefore, is that the law on the demurrer to evidence was for the plaintiffs in the action, and that the judgment of the circuit court is clearly right and ought to be affirmed.

MAXWELL, J., concurred.

JUDGMENT AFFIRMED.