# CHARLESTON.

## HOLLY RIVER COAL CO. *v.* HOWELL.

Submitted January 27, 1892.—Decided April 16, 1892.

1. DELINQUENT AND FORFEITED LANDS—FORFEITURE—TAXES—CONSTRUCTION OF STATUTES.

   By the act of the legislature of the State of Virginia enacted April 1, 1831, a certain class of lands was forfeited for nonpayment of taxes, called "delinquent lands." By the act of February 27, 1835, a certain other class of lands was forfeited for nonentry on the proper land-books, called "omitted lands." After a day given, the forfeiture of the delinquent class of lands became absolute and complete on the 1st October, 1834, and the forfeiture of the class of omitted lands became absolute and complete on the 1st November, 1836; and no inquisition or judicial proceeding or inquest or finding of any kind, was required to consummate such forfeiture. (pp. 499, 500.)

2. DELINQUENT AND FORFEITED LANDS—CONSTRUCTION OF STATUTES—FORFEITURE.

   The acts of the legislature of Virginia of 30th March, 1837, and 15th March, 1838, and amendments *in pari materia*, created and provided for putting in operation a proceeding to ascertain and determine what lands were thus forfeited; and an officer called the "Commissioner of Delinquent and Forfeited Lands" was provided for the purpose, whose duty it was to ascertain and report such lands to the circuit superior court of law and chancery for his county. (p. 500.)

3. DELINQUENT AND FORFEITED LANDS—FORFEITURE.

   Such proceeding is a judicial one, in the nature of a proceeding against the land itself; and, when completed by a sale, is

62

*prima facie* evidence of such forfeiture against all persons. And the orders and decrees made therein are conclusive against strangers in all collateral proceedings. (p. 501.)

4. DELINQUENT AND FORFEITED LANDS—FORFEITURE—TITLE.

The policy of these laws was to quiet titles as far as possible, and to convey a good title under these sales as far as the commonwealth had the means of so doing; and, if the ownership of such lands was vested in the commonwealth by reason of forfeiture of one or more titles, such title as the commonwealth thus had passed to the purchaser by the deed of the commissioner of delinquent and and forfeited lands; and he who connects his title with such deed connects it with the commonwealth, so far as the same is valid, and so far as any right or title was in the commonwealth to be conveyed. (p. 504.)

5. EJECTMENT.

In an action of ejectment the general rule is that a plaintiff must recover upon the strength of his own title, and not upon the weakness of defendant's title; for the reason that defendant is not required to give up possession until the true owner demands it; and the right to show in defence a subsisting outstanding title rests upon the same principle. (p. 509.)

6. EJECTMENT.

Before the plaintiff can recover he must identify the land claimed, so far as the exterior boundaries are concerned. (p. 509.)

7. EJECTMENT.

To show payment of taxes is not a *sine qua non* to plaintiff's right to recover, unless such payment is one of the elements of his title. (p. 510.)

8. EJECTMENT.

The party's right of ownership or claim of right extends to his outside boundary lines, and is not limited by the number of acres called for. (p. 511.)

9. POSSESSION—HUSBAND AND WIFE.

A husband is in actual possession proper, that is, by some visible mark of ownership, of a part of a tract of land, the sole and separate property of his wife. There being nothing to countervail it, he has thereby constructive actual possession of the residue—that is, actual possession of the tract—on the principle that such possession of a part is possession of the whole, within the purview of the statute of limitations. (p. 512.)

10. POSSESSION—HUSBAND AND WIFE.

The husband in his own right owns or claims, under a colorable title, a contiguous tract wholly unimproved, with no visible mark of ownership upon it. Such actual possession proper, and resulting constructive actual possession of the residue of the land of the wife, does not, of itself, give the husband actual possession, of either kind, of his own adjoining tract. (p. 513.)

*W. E. Haymond* for plaintiff in error cited 28 W. Va. 820; 10 Gratt. 445; 13 Gratt. 152, 163; Harlow § 8; 27 W. Va. 763.

*Dayton & Dayton* for plaintiff in error cited 6 Pet. 498; 54 Ill. 254; 70 Pa. St. 31; 41 Ind. 466; 49 Miss. 411; 2 How. 43; 40 Wis. 482; 8 Blackf. 237; 4 Munf. 310; Id. 431; 2 Leigh 329; 5 Gratt. 168; 15 Gratt. 213; 6 Gratt. 277; 14 Gratt. 30; 7 Leigh 22; 3 Rand. 473; 4 Rand. 585; 1 Leigh 231.

*L. D. Strader* for defendant in error cited 24 W. Va. 238; Id. 606; 28 W. Va. 825; 27 W. Va. 480; 26 W. Va. 345; 6 W. Va. 258; 30 W. Va. 43.

HOLT, JUDGE:

This is an action of ejectment brought in the Circuit Court of Webster county by the Holly River Coal Company, a corporation of the State of West Virginia, against J. B. Howell, on the 24th day of February, 1889, the declaration being served on that day. It resulted in a verdict for the plaintiff for all except sixty five acres, which the court refused to set aside and gave judgment thereon; and the defendant has appealed.

The first error complained of is that defendant's demurrer to the declaration was overruled. The plaintiff is a corporation suing for a tract of three thousand one hundred and five acres situated on Holly river and its waters in Webster county. The plaintiff sues as a corporation, as it may do, and the proof is matter of fact for the court or jury on the evidence; but by section 41, c. 125, of the Code (1891) it is not necessary to prove the existence of the corporation, the general issue of not guilty not being verified, and there being no affidavit denying its existence.

"Unless specially authorized, no corporation shall purchase real estate in order to sell the same for profit, nor hold more real estate than is proper for the purposes for which it is incorporated," (chapter 52, § 3;) "but a mining company," *etc.*, "may lay out a town, not to include more than six hundred and forty acres, at or near their works," (section 4, c. 52;) and by chapter 53, § 62, "a company for mining and selling coal may own ten thousand acres."

This question also can only arise upon the proof, not upon demurrer, unless the declaration shows on its face that they are suing for more than they are authorized to hold.

Chapter 90, Code (1891) p. 699, relates to ejectment, and was enacted in the Revisal of 1849 for the first time. See Code 1849, c. 135 (Ed. 1860) p. 609, and note. It was taken substantially, as to its main features, from the statutes of New York. It abolished real actions, and went into effect July 1, 1850. It prescribes with considerable detail the essentials of pleading, proof, defences and procedure generally. It provides that it shall be sufficient for plaintiff to aver in his declaration that he was possessed of the premises claimed, and that he claims them in fee or according to the fact, and being so possessed that defendant afterwards entered into such premises and unlawfully withholds from plaintiff the possession thereof, to his damage, *etc.* It also provides that the premises claimed shall be described in the declaration with convenient certainty, so that from such description possession thereof may be delivered, and may contain several counts, *etc.* The plea is, not guilty.

This declaration contains two counts. The first is for the whole tract, giving the metes and bounds, the corners and the lines by course and distance, and as lying on Holly river and various branches, giving the names. Here the certainty is convenient, if it can be made so by definiteness and particularity of description of the land sued for.

The second count describes a tract of fifty acres in the same way; by corners, lines, courses and distances with great definiteness and particularity (I do not see how it would have been described more definitely and particularly) and avers that the fifty acres lie within the boundary of the tract of three thousand one hundred and five acres.

The case is not like that of *Hitchcox* v. *Rawson*, 14 Gratt. 526 (1858.) There the declaration averred that defendant entered into the premises, the whole tract described, and unlawfully withholds from him the possession of two hundred acres, a portion of the one thousand and one hundred acre tract. The description of the two hundred acres was also clearly wanting in convenient certainty of description.

This defect was not cured by the verdict which followed the declaration; and judgment was given according to the verdict; and so there was not such certainty as the law required.

In this case the two tracts, three thousand one hundred and five acres and fifty acres, are put in separate counts, and each described with all the certainty that could be reasonably required, within the most rigid construction of the statute; and it does not aver that defendant entered into the premises, the tract of three thousand one hundred and five acres, and unlawfully withholds the fifty acres, part thereof, but that defendant entered into the fifty acres, a part of the three thousand one hundred and five and unlawfully withholds the same. It is more than ordinarily convenient, intended, no doubt, to be certain without an order of survey or even a verdict, and also made to meet the case as it turned out, viz., a finding for defendant as to the fifty (sixty five) acres, and for plaintiff as to the residue of the tract of three thousand one hundred and five acres. Here we have two different descriptions, in two different counts, of two different tracts; one being a description of a small tract, a part of and within the other. What is there to prevent the two descriptions standing together? It is not like the case of *Inge* v. *Garrett*, 38 Ind. 96. In this case there is no antagonism between the two, nor does the question, if any, arise on demurrer, which was therefore properly overruled.

(1) Plaintiff offered in evidence a copy of a grant from the commonwealth of Virginia to John Signey for ten thousand acres, dated 15th August, 1787, by survey made in Harrison county, 5th July, 1785, said grantee being assignee of Claudius Paul Raguet, said survey lying on Elk river and the Holly fork of the same; and giving the corners and lines, with courses and distances.

(2) A copy of three orders of the Circuit Superior Court of law and chancery held for the county of Braxton, at the court-house, on Tuesday, 12th April, 1842; also order of same court, entered 13th April, 1843, confirming report of sale as follows: "Order reporting forfeiture: The commissioner of delinquent and forfeited lands for the county

of Braxton this day made a report in writing that two tracts of land, of which Lydia Ragnet died seised, one of ten thousand acres, granted to John Ligney, the other one thousand acres, granted to John Reed, are forfeited for the failure to enter the same on the commissioner's books of of said county, and of the payment of the taxes accruing thereon. On motion of the attorney for the commonwealth, it is ordered that the said lands be sold by the said commissioner on the first day of the next August court, to be holden for the said county, at the court-house door of the said county, in the manner and upon the terms prescribed by law, first platting out all such interfering claims as are by law exempted from sale, and also, if he deem it expedient in order to effect an advantageous sale, sell said lands in parcels, and that he report to court. Order: The commissioner of forfeited and delinquent lands this day made his report of a sale of a tract of ten thousand acres heretofore ordered to be sold, and was forfeited in the name 'Lydia Ragnet's Heirs;' the said tract of land having been laid off by the said commissioner into eleven tracts or parcels, to wit, Nos. 1, 2, 3, 4, 5, 7, and 10, of one thousand acres each, No. 6, of nine hundred and eighty seven acres, No. 8 containing nine hundred and twenty acres, and No. 9 containing seven hundred and eighty acres, and No. 11 containing three hundred acres. And it further appears to the court that George C. McCall, agent for the owner of said land, became the purchaser of lots Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 at the sum of one hundred and ninety seven dollars and sixty five cents which said sale the court doth affirm. And it further appearing to the court that a certain Robert Ervin became the purchaser of No. 11, containing three hundred acres, for the sum of five dollars and seventy five cents and the commissioner having reported the expenses of the sale, amounting in all, exclusive of clerk's fees, to the sum of one hundred and fifty dollars and forty one cents including the sale of lot No. 11, but deducting the amount expenses of the sale of lot No. 11, a balance will remain in hands of commissioner of forty six dollars and ninty cents, which, after deducting clerk's fees, the commissioner of forfeited and delinquent lands will pay over

and settle with the auditor of public accounts. And the court not affirming the sale of lot No. 11, containing three hundred acres, to Robert Ervin, on the motion of George C. McCall, who has filed his petition praying the court to set aside said last mentioned sale, it is ordered that Robert Ervin be summoned to appear on the first day of the next term to show cause, if any he can, why the said petition should not be heard, and said sale be set aside; and that a copy of this rule be served upon the said Ervin."

At another day, to wit, at a Circuit Superior Court of law and chancery held for the county of Braxton, at the court house thereof, on Tuesday, April 15, 1845 : "George C. McCall, agent of the heirs at law of Claudius Paul Ragnet v. Robert Ervin. Upon a rule to show cause why the tract of the sale of lot No. 11, as designated in the plat of the commissioner of delinquent and forfeited lands sold at a previous term of this Court by William P. Haymond, the commissioner, to said Ervin, should not be set aside. Upon inspection of the papers, the court is of opinion that said sale be set aside, and all the proceedings therein had be null and void; and that the said commissioner of delinquent and forfeited lands of the county of Braxton, before the court-house door of the said county, resell the same—the sale to take place at the August County Court next, first advertising the sale as the law directs."

At another day, to wit, at a Circuit Superior Court of law and chancery held for the county of Braxton, at the court-house thereof, on Saturday, September 13, 1845 : "The commissioner of delinquent and forfeited lands for the county of Braxton this day made a report of the sale of lot No. 11 of a tract of land of ten thousand acres, which lot contains three hundred acres, and heretofore ordered to be sold and forfeited in the name of Ragnet's heirs; and that at said sale Thomas Green purchased said lot at the price of twenty dollars and twenty five cents, which sale is confirmed by the court; and the commissioner having reported the expenses of said sale, exclusive of clerk's fees, to amount to ten dollars and fifty cents, which is adjudged to be reasonable, it is ordered that the residue of the proceeds of sale, after deducting the expenses of sale, together with

the clerk's fees, when ascertained, be paid into the treasury, and that the clerk make out a report of this proceeding, and forward to the auditor of public accounts. I, C. Y. Byrne, clerk of the Circuit Court of Braxton county, certify that the foregoing is a true transcript of the record in my office. C. Y. BYRNE, Clerk."

And two deeds from William P. Haymond, commissioner of delinquent and forfeited lands for Braxton county, State of Virginia, to George C. McCall—one dated 10th November, 1849 ; the other dated 10th January, 1846—to same.

.. These orders were admissible to justify the commissioner's deeds.. "The admissibility of the record for that purpose, as a fact introductory to a link in the chain of title, and constituting a part of the muniments of the party's estate, is a matter of familiar recognition and constant practice." *Baylor* v. *Dejarnette*, 13 Gratt. 152–163.

Second deed : "This indenture, made the 10th day of November, in the year 1849, between Wm. P. Haymond, commissioner of delinquent and forfeited lands for Braxton county, in the State of Virginia, of the one part, and George C. McCall, of the county of Wood and State aforesaid, of the other part, witnesseth : That whereas, by order of Edwin S. Duncan, judge of the Circuit Superior Court of law and chancery for said Braxton county, made at the spring term of said court in the year 1842, the said Wm. P. Haymond was ordered to make sale of the land hereinafter described at the court-house of said county ; and whereas, the said Wm. P. Haymond, under and by virtue of said order did, as such commissioner, on the 2d day of August, 1842, at the court-house of said Braxton county, offer for sale at public auction the following described tract or parcel of land, situate in said county of Braxton, on the waters of Holly river, a branch of Elk river, and bounded as follows, to wit: Beginning at a sugar tree (formerly a chestnut) corner to Robert Lylburn's survey No. 2, and running thence S., 35 W., 320 poles, to a beech ; N., 55 W., 110 poles, to a stake ; S., 35 W., 437 poles, to a stake.; S., 55 E., 110 poles, to a stake ; S., 35 W., 843 poles, crossing both forks of the main right-hand fork of said Holly above the Sand lick, to a poplar, (formerly gum ;) thence N., 55 W., 1,000 poles,

crossing the main right-hand fork of Holly about three fourths of a mile below said lick, near the mouth of a run and two branches, to a chestnut and chestnut oak, (formerly a sugar tree,) corner of Isaac Skidmore's survey No. 4; thence, by Skidmore's line, N., 35 E., 1,600 poles, crossing Old Lick run and Hodam's creek, to a maple (formerly sugar) standing on the ridge between said creek and Hacker's Lick run, and about 80 or 100 poles from said lick; S., 55 E., 1,000 poles, crossing left-hand branch of Hodam's creek, to the beginning—containing nine thousand seven hundred acres, embracing lots from No 1 to No. 10, both inclusive, of a tract of 10,000 acres of land, as laid off and sold by said commissioner in the name of Claudius Paul Ragnet. Said 10,000 acres was surveyed for Robert Lylburne, and patented to John Ligney, on the 5th day of August, 1787, and subsequently conveyed to said Ragnet; at which sale the said George C. McCall, being the highest ——, became the purchaser for the sum of one hundred and ninety seven dollars and thirty five cents, which said sum hath been paid to the said Wm. P. Haymond as such commissioner: Now, therefore, in consideration of the premises, the said Wm. P. Haymond, as such commissioner, doth hereby grant, bargain, and sell unto the said George C. McCall the above-described tract of land, with its appurtenances, to have and to hold the said tract of land, with its appurtenances, to the said George C. McCall, his heirs and assigns, forever. In witness whereof the said Wm. P. Haymond, as such commissioner, hath hereunto set his hand and seal. Wm. P. Haymond, C. of D. and F. Land for B. C. [Seal.]"

First deed: "This indenture, made the 10th day of January, in the year 1846, between W. P. Haymond, commissioner of delinquent and forfeited lands for Braxton county, in the State of Virginia, of the one part, and George C. McCall, of the city of Philadelphia and State of Pennsylvania, of the other part, witnesseth: That whereas, by order of Edwin S. Duncan, judge of the Circuit Superior Court of law and Chancery for said county, made at the spring term, 1842, the said Wm. P. Haymond was ordered to make sale of the land hereinafter described, at the court-

house of said county; and whereas, the said Wm. P. Haymond, under and by virtue of said order did, as such commissioner, on the second day of August, 1842, at the courthouse of said county, offer for sale at public auction the following described tract or parcel of land, situate in said county of Braxton, on the waters of Holly river, and bounded as follows, to wit: Beginning at a sugar tree, (formerly chestnut,) corner to Robert Lylburn's survey No. 2, and running thence S., 35 W., 320 poles, to a beech; W., 55 W., 110 poles, to a stake; S., 35 W., 437 poles to a stake; S., 55 E., 110 poles, to a stake; S., 35 W., 843 poles, crossing both forks of the main right-hand fork of Holly above the Sand lick to a poplar (formerly) a gum;) thence N., 35 W., 1,000 poles, crossing the main right-hand fork of Holly, three fourths of a mile below the Sand lick, and two branches of Old Lick run, to a chestnunt and chestnut oak, (formerly a sugar tree,) corner to Isaac Skidmore survey No. 4; thence, by his line, N., 35 E., 1,600 poles, crossing Long run and Hodam's creek to a maple, (formerly a sugar tree,) standing on the point between said creek and Hacker's Lick run, and about 80 or 100 poles from said Hacker's lick, S., 55 E., 1,000 poles, crossing a left-hand branch of said creek, to the beginning—containing 9,700 acres, embracing lots from No 1 to No. 10, both inclusive, of a tract of 10,000, as laid off and sold by said commissioner in the name of the heirs of Claudius Paul Ragnet. Said 10,000-acre tract was surveyed for Robert Lylburn, and patented to John Ligney, on the 5th day of August, 1787, and subsequently conveyed to said Ragnet; at which sale, the said George C. McCall, being the highest bidder, became the purchaser for the sum of one hundred and ninety seven dollars and twenty five cents, which said sum hath been been paid to the said Wm. P. Haymond, commissioner: Now, therefore, in consideration of the premises, the said Wm. P. Haymond, as such commissioner, doth hereby grant, bargain, and sell unto the said George C. McCall the above-described tract of land, with its appurtenances, to the said George C. McCall, his heirs and assigns, forever. In witness whereof the said Wm. P. Haymond, as such commissioner, hath hereunto set his hand

and seal.    Wm. P. Haymond, C. of D. and F. Lands, B. C. [Seal.] ''

For the laws upon the subject of delinquent and forfeited lands I here refer generally to Harlow on Delinquent and Forfeited Lands and Hutchinson's Land Titles, and especially to the opinion of Judge SNYDER in *McClure* v. *Maitland,* 24 W. Va. 561, in which there is a full reference to and discussion of these laws, and especially of the difficulties in enforcing the payment of taxes on certain lands, which led to their enactment.

The land-office was established by Act May, 1779, which provided for grants.    Act June, 1788, authorized what are called "inclusive" (exclusive) surveys, which lasted in effect until 1796.    By the year 1800 the State had granted pretty much all its lands to individuals, by surveys containing, not only one thousand acres, but in tracts of one hundred thousand acres and more, often two or three grants covering the same land.    Then came the question of taxes.    The lands were wild and uncultivated, and generally hilly or mountainous.    The owners were very often non-residents, unknown or residence unknown, who paid no taxes, and of whom no taxes could be collected.    Then came a series of acts, from 1781 to 1828, by which the lands were sold by the sheriffs for taxes, and, no one bidding, were bought in for the president and directors of the literary funds.

Among these acts was that of February 9, 1814, very comprehensive and carefully drawn, which has been the great exemplar for all laws since for the sale of delinquent lands by the sheriff.    See Harlow, Delinq. & Forf. Lands, p. 119.    This act made all lands and lots, sold or vested already in the president and directors of the literary fund (see volume 1, Code 1819, p. 82) on account of delinquencies theretofore accrued, redeemable in the same manner as lands theretofore sold and so vested, and it repealed all laws forfeiting lands for failure to enter them upon the land-books, and all forfeitures of such omitted lands were thereby remitted.

Then, after a long cessation, came the act of April 1, 1831, forfeiting certain lands theretofore delinquent for non-payment of taxes ; and the act of March 11, 1834, ex-

tending the right of redemption to October 1, 1834, at which date such forfeiture for non-payment of taxes on lands entered on the land-books became absolute and complete.

Then the act of 27th February, 1835, forfeiting certain lands then omitted, for such failure to enter them on the land-books, which last forfeiture became absolute and complete, by operation of law, on 1st November, 1836.

For a full review of these laws, and the policy which dictated them, see *McClure* v. *Maitland,* 24 W. Va. 561, and cases cited; and *Twiggs* v. *Chevallie,* 4 W. Va. 463, and *Strader* v. *Goff,* 6 W. Va. 257.

By the act of 30th March, 1837, and act of 15th March, 1838, the legislature conferred jurisdiction upon the Superior Court of Law and Chancery to institute an inquest of forfeited lands, and created the office of commissioner of delinquent and forfeited lands for that purpose, whose duty it was to ascertain and report to court the quantity of delinquent and forfeited lands in his county, designating particularly the number of tracts, and the quantity contained in each tract, also the local situation and probable value of each tract together with all the information which he might be enabled to procure in relation to the state of the title to said lands; and upon the return of said commissioner it was the duty of said Circuit Superior Courts of Law, by orders entered of record, to direct said commissioner to make sale of said lands in the same manner and in all respects as in the case of other lands directed to be sold under decrees of said courts; and by section 9 of act of 1838 the commissioner was directed to make a deed to the purchaser upon payment of the purchase-money, without any order of court. See, also, Act 18th March, 1841, Act 22d March, 1842; Act Feb. 13, 1844 (the former owner given three years in which to petition and contest the legality or justice of the sale.)

Act March 5, 1846, gave the commissioners of delinquent and forfeited lands to complete their reports until the close of the fall terms of the court in the year 1846. Here these proceedings closed, except the execution of deeds and making sales made under reports, orders, and decrees of the fall term, 1846.

The case of *Hoge* v. *Currin*, 3 Gratt. 201, decided in 1846, is not important. The first case of importance involving sales under these laws was the case of *Walton* v. *Hale*, 9 Gratt 194 (1852) which held that the recitals in the deed of the commissioner of delinquent and fofeited lands were not evidence against a party claiming adversely to the deed.

In the year 1853, four cases on the subject were decided by the court of appeals of Virginia, all reported in 10 Gratt. which settled the main points of doctrine, and have ruled the subject from that day to this. Taking them in their order, they are *Staats* v. *Board*, 10 Gratt. 400; *Wild* v. *Serpell*, Id. 405; *Hale* v. *Branscum*, Id. 418; (*Flanagan* v. *Grimmit*, Id. 421, important as relating to a ministerial tax sale made by the sheriff under act of 1814, as contrasted with those judicial sales;) and *Smith* v. *Chapman*, Id. 445, in which last case Judge LEE, familiar with the subject, gives a full exposition of these laws and the policy which led to them, and lays down the doctrine, ever since adhered to with only a seeming exception or qualification in the case of *Twiggs* v. *Chevallie*, 4 W. Va. 463 (1871.)

The forfeitures became complete and absolute by operation of law—in the case of delinquent lands on the 1st day of October, 1834, and in the case of omitted lands on 1st November, 1836, and no inquisition or judicial proceeding or inquest or finding of any kind was required to consummate such forfeiture; yet the act of 1837, § 3, prescribed, as preliminary to sale, that the court of chancery should set on foot, through its officer the commissioner of delinquent and forfeited lands created for the purpose, a judicial inquisition to ascertain and report all lands so forfeited, which was in the nature of a proceeding against the thing itself, though not conclusive, except against strangers to the forfeited titles. Yet the proceeding is expressly made judicial, and the orders and decrees made in it can not be drawn in question by strangers to the title in any collateral proceeding. As against strangers, those claiming under the proceedings in forfeiture, and the deed of the commissioner of delinquent and forfeited lands made in pursuance thereof, can not be called upon to show its regularity.

It is manifest, from the whole scope and tenor of the acts

on this subject, that the regularity of the sale of forfeited lands under the decree of the court was never intended to be drawn in question in any collateral proceeding. The fourth section of the act of 1837 places the sales of these lands on the same footing as those of other lands directed to be sold by a decree of a court; and where such a sale has been made and confirmed, and a deed executed to the purchaser, he certainly can not be called upon to show that the proceedings in the suit, which resulted in the decree of sale under which he purchased and its confirmation, were regular, nor, if irregularities were shown, would he be affected. The very object of these laws was to make the proceeding a judicial, as distinguished from a ministerial, sale made by a sheriff or marshal for taxes. These latter sales had already been made practically nugatory; for to them had constantly been applied the rule that, "where a naked power is given by law to an officer or other person, that power must be strictly pursued, especially if, by the exercise of such power, the estates or rights of others may be forfeited or lost; and it will devolve on him who claims a right, under the exercise of such power, to show that it was in all respects exactly pursued." *Nalle* v. *Fenwick,* 4 Rand. (Va.) 588 (1826).

This rule was applied in that case to a ministerial sale for taxes made by the sheriff under the act of 1781 and act of 1782. Such ministerial sales for taxes had proved in all cases, where brought into question, a delusion and a snare to the purchaser; and the commonwealth after a patient waiting from 1815 to 1837 determined to no longer rely alone upon them. Hence the proceeding was made judicial, or *quasi* judicial; and for this purpose committed to the one great court of original and general jurisdiction, and to the chancery side thereof, that branch having its origin in the highest exercise of original jurisdiction, and conforming its methods and procedure to the civil law, and wherein all liens were enforced and all mortgages foreclosed, and expressly likened it to such proceedings.

Mr. Black, in his work on judgments (chapter 20, § 792 *et seq.*) discusses this subject. Under the head of "A Judgment *in rem*," he gives various definitions, among others

the following: "Where the process is to be served on the thing itself, and where the mere possession of the thing itself by the service of process and making proclamation authorizes the court to decide upon it without notice to any individual whatever, it is a proceeding *in rem.*, to which all the world are parties.

Chief Justice MARSHALL, in *Mankin* v. *Chandler*, 2 Brock. 125, holds that a judgment *in rem* is a proceeding to determine the status or condition of the thing itself, and it *ipso facto* renders it (*prima facie* in this case) what it declares it to be (viz., forfeited.) Besides the notice given by the various laws, the auditor was required specially to cause to be published in certain newspapers the act of 1831 for a term not exceeding one month, as he should think necessary, to give notice of the provisions thereof. Section 6, Acts 1831; Harlow, Land Laws, p. 15. And by section 6 he was required to have printed lists in quarto form of such delinquent lands, "and shall cause the same to be extensively circulated throughout the commonwealth and in other states; and shall cause two hundred copies thereof to be bound, and shall send them to be deposited in the clerk's office of every county and corporation in the commonwealth."

It is a matter of public history that these notices were given, and the acts show that the proceedings in forfeiture were postponed until such notices could be and had been given. And so notice of the sales ordered were required to be published and posted in various places. The purchasers became *quasi* parties to the proceeding, as in other chancery proceedings, and the prosecuting attorney represented the state in these proceedings in court. By section 7, Act March 15, 1838, lists were again required to be made out and published; and section 6, Id.: "The judges shall also have power, in term or vacation, to recommit said reports, or set them aside, and direct others, by orders on record, as aforesaid, when in term, and by endorsement, as aforesaid, when in vacation." The court took jurisdiction by laying its hand upon the things itself; sending on to the land the commissioner of delinquent and forfeited lands with his surveyors to locate it; making corners, lines

and various monuments of boundary; laying it off into convenient lots; and, if need be, protecting the timber from spoliation until it was sold. · This taking control of and dominion over the land itself was what gave the court jurisdiction in the particular case without regard to whether it should turn out to be forfeited in fact or not; and it could and did acquit, as well as condemn; and being a lawfully constituted court, proceeding in the manner prescribed by law, its orders and decrees were not merely ministerial; and having power to declare and apply the law to the particular land under its control it had jurisdiction to deal with it as land to which the laws of forfeiture applied; but the proceeding being *ex parte*, and only in the nature of a proceeding *in rem*, its orders and decrees had not conclusive binding force upon all the world, but were only *prima facie* evidence of forfeiture.

It can not be doubted that the policy of the legislature in the various acts concerning delinquent and forfeited lands was not only to secure the commonwealth her just dues, but also (and in the main) to quiet titles in the western part of the State, and to remove the check to population and to the settlement and improvement of the country, which their unsettled condition served to create. The policy of the law was to convey a good title under these sales as far as the commonwealth had the means of so doing; and if the ownership was vested in the commonwealth by reason of the land having never been granted, or by reason of forfeiture for non-payment of taxes or omission from the land-books under one or more titles, such title as the commonwealth had, passed to the purchaser at the forfeiture sale by the commissioner of delinquent and forfeited lands. It was a conveyance of the commonwealth's right, made under authority of law in the appointed mode, and those who connect themselves with such conveyance connect themselves in derivation of title with the commonwealth.

This disposes of defendant's objection to the copies of the deeds of William P. Haymond, commissioner of delinquent and forfeited lands, to McCall, the purchaser, and the accompanying records. I have seen trials in which the

order of qualification of the commissioner was, out of abundant caution, put in evidence to show his authority and his report of sale ; but they were not necessary in this collateral proceeding against a stranger to the title, because the commissioner is recognized as such in the record, and his report of sale is sufficiently recited in the order of confirmation, and his report of forfeiture in the order of sale. The calls of the two deeds of the commissioner are the same. The second deed was evidently made to correct a mistake in the call of the quantity of the first.

A second reason why these deeds and records were admissible is they were duly certified copies of a record and of deeds duly admitted to record, and were therefore competent evidence as color of title, if for no other reason, so far as they were germane to the issue on trial. The court did not pass upon their legal effect in conveying or transferring the legal title.

Plaintiff next introduced certified copies of the following deeds, duly admitted to record, for a part of the same land : Deed from George C. McCall to Thomas S. Wood and Jacob Lorentz, Jr., dated April 1, 1853, for eight thousand five hundred acres, part of same tract ; deed from Jacob Lorentz to C. S. Hurley for an undivided moiety of seven thousand acres, part of the same tract, and dated February 3, 1858; deed of partition dated August 8, 1860, by which C. S. Hurley and wife conveyed to T. S. Wood, by metes and bounds three thousand five hundred acres thereof, to have and to hold in severalty ; a deed from Mary J. Heironimus, Martha A. Baker, sisters of Thomas S. Wood, deceased, Annie C. Wood, Henry G. Wood, Annie M. Lewis, Margaret L. Labbon, Edwin T. Gold, William M. Gold, Alice M. Whitman, Emma S. Carter, Margaret S. Gold, and Mary T. Gold, heirs at law of Thos. S. Wood; deed to Hinsdale Smith, Gurdon Bill, Nathan D. Bill, and Harden P. Stone, dated June 26, 1886, and a deed from these grantees to plaintiff, the Holly River Coal Company, dated 20th December, 1887, conveying, by metes and bounds, three thousand one hundred and five acres, after excepting and excluding from the three thousand five hundred acres, by definite metes and bounds, a tract of one hundred acres,

a tract of fifty six acres, a tract of one hundred and fifty nine acres, and a tract of eighty acres; a deed from C. P. Dorr, special commissioner, to plaintiff, dated 22d December, 1888, for the interest of Nora B. Wood, Alice G. Wood, and Lewis B. Wood in the tract of three thousand one hundred and five acres.

The court certifies that there was evidence tending to show that Mary J. Heironimus and others, parties to the deed aforesaid to Hinsdale Smith and others, are the heirs at law of Thomas S. Woods, deceased.

On April 8, 1889, defendant pleaded not guilty, the issue was joined, and the surveyor of lands of the county was ordered to go upon the lands in the declaration mentioned, and do such surveying as might be required by either party, and return three reports and seven fair plats of the same. Bernard Mollahan, surveyor, on the 25th October, 1889, returned the reports and maps, which latter are in the manuscript record, and make plain and intelligible the location of the land sued for, the adverse claims of defendant, and the point where defendant has possession by a visible mark of ownership. He marks or reports no other, nor is there any evidence tending to show any other at any place.

This is a claim on a tract of fifty acres (sixty five by actual running) granted to Walter Cool by patent dated 1st July, 1855, on survey made 2nd April, 1854. It is stated in the bill of exceptions that defendant offered papers tending to show title in his wife to the same, and evidence tending to prove an adverse possession for more than ten years prior to the institution of this suit. The Cool grant for fifty acres was in evidence. This tract the jury found for the defendant. The bill of exceptions also certifies that there was no evidence tending to show forfeiture of said ten thousand-acre tract for non-entry or otherwise in the name of John Ligney prior to 1867, other than the evidence aforesaid; that there was evidence tending to show that the heirs of Thomas S. Wood had actual possession of the three thousand five hundred acres from 1872 to 1884; that the surveyor certified that the grant to John Ligney covered the land in controversy; that defendant introduced evidence tending to show that the land claimed by plaintiff

had been omitted from the land books of the assessor for five consecutive years; that it was returned delinquent for the taxes for the years 1878 and 1880, and no evidence of payment of taxes for those years or for 1882 and 1883.

There was evidence tending to show that defendant resided on and occupied the fifty-acre tract claimed by his wife under the "Cool patent," and that it was adjoining the tract of one thousand and seventy acres claimed by him; and evidence tending to show that John A. Howell had, by a writing, sold said boundary designated as "one thousand and seventy acres" to one Samuel Cutlip, and that Cutlip had taken actual possession thereof, and that defendant acquired the color he claimed to said land from Cutlip; but his color of title, whatever it may be, is not shown, and all the evidence is not certified; but there is set out the deposition of H. W. Heironimus, taken and read on behalf of plaintiff.

The assessor's land-books of Webster county, from 1867 to 1889, both inclusive, were read in evidence by plaintiff, which showed that for those years the ten thousand acre-grant to John Ligney was not entered for taxation; but that the land claimed by plaintiff had, in the year 1867, been on the land-books in the name of C. S. Hurley, and for the other years had been on said books for taxation in the name of Thomas S. Wood's heirs. Thereupon the defendant moved the court to exclude the evidence of plaintiff from the jury, which motion the court overruled, and defendant excepted. Upon this motion of defendant to strike out plaintiff's evidence *in solido*, the ruling of the court refusing to do so was right, for at least two reasons.

In this class of classes the proper function of the motion to strike out comes frequently into play. The parties, especially the plaintiff, generally sets out to darraign a title, if not running back to the commonwealth, yet generally containing many links, some of doubtful strength—and the chain can not be stronger than the weakest link—for the purpose of transmitting the legal title; proof of which is one of the objects in view; but running with it, as a reserve, is the purpose of falling back or catching on to a color of title, if the chain should break. Therefore, for many

reasons which occur at once, great latitude is allowed in the order and method of producing his evidence; so that papers, and other means of proof, must more or less be let in provisionally and on trust. Hence, also, a time in the trial generally comes wherein the court is called on to give the legal effect as to the transmission of the legal ti le, or limiting it to color of title, or striking out this or that not proved as promised and expected, and thus winnow and screen it as a whole in various ways.

But, to accomplish this, in fairness to the court and the parties, it will not do for the defendant, as in this case, to say, "I object to all this mass of evidence, and move to strike it out in *solido*." He must put his finger on the spots, one by one, pointing out each item of evidence objected to. In this general form of objection to evidence in mass, the court could not grant the motion to strike out, and will be justified in such refusal, if any part be competent and for any purpose germane to the very general issue. See *Brown* v. *Town of Point Pleasant, supra* p. 290 (15 S. E. Rep 209) and authorities there cited.

This brings us to the second and sure ground on which the ruling of the court may well stand. The court below did not thereby say, by implication or otherwise, that the legal title had thus been transmitted to plaintiff from the commonwealth without break, but may have very properly put it upon the ground that these papers are sufficiently proved (one or more of them) to be competent and therefore good as color of title at least; especially in view of the fact that the court certified that there was evidence tending to prove that the heirs of Wood were in actual possession of the three thousand one hundred and five acres sued for from 1872 to 1884.

The deposition of H. W. Heironimus, a witness examined in behalf of plaintiff, was taken on the 25th of March, 1887, in which there are seventeen questions and answers, in one of which he says, when on the tract of three thousand one hundred and five acres attending to it for the heirs of Wood, defendant expressed a desire to buy the fifty-acre Cool tract where he lived. Defendant for the first time at the trial objected to the questions numbered 6, 7, 8,

10, 12, 13, 14, 15, and 17, which objection the court over-ruled as to questions and answers 7, 8, 12, 13, 14, and 17.

In No. 7 he was asked if he had paid the taxes on said tract of land at any time, and for what years, and for whom. He answered that he had paid the taxes for the entire twenty four years; he had charge of them for T. S. Wood, deceased, and for his heirs; and that the tax-receipts were filed in a suit about 1881 or '82 of Wood's heirs against Adams & Corley, in Webster Circuit Court, and, if not burned with the records of Webster Circuit Court, were in possession of Mr. Dorr. Under the circumstances, such evidence was not incompetent.

All the other objections overruled related to the manner in which the answers were drawn out, and not to the substance or subject-matter as incompetent and inadmissible in any form. Such objections came too late, when made for the first time without excuse, when offered to be read to the jury. These errors, if any, were harmless—a species of error that has made great advance in recent years.

Defendant asked for eight instructions. Nos. 1, 2, and 3 were given; Nos. 4, 5, 6, 7, and 8 were refused, and defendant excepted.

"No. 1. The court instructs the jury that the plaintiff, in an action of ejectment, must recover upon the the strength of his own title, and not upon the weakness of defendant's title." This was given, and is correct where the one is not in under the others title. And the reason for it is that the defendant in possession and the *prima facie* owner is not required to give up the possession until the true owner demands it. And the doctrine of setting up a subsisting, outstanding title in a stranger rests upon the same foundation.

"No. 2. Before plaintiff can recover, he (it) must prove the identity of the land claimed by him, and, if the identity of said land is not proved by plaintiff to the satisfaction of the jury, they must find for defendant." This was given. The plaintiff must, by the aid of helping evidence, show that the calls of boundary in his title papers are or have been located on the ground, so as to give his ownership of the land claimed a definite location on the ground, includ-

·ing all or a part of the land in controversy ; and to bring this properly before the jury, and, make the evidence of boundary intelligible, the surveyor, as in this case, goes upon the land, surveys more or less according to the claims and pretensions of the parties, and returns his maps or plats as the result of such work.

"No. 3. If the jury do not believe from the evidence that the plaintiff has connected its title regularly with a grant from the commonwealth, they must find for defendant." This, as we have already seen, was done, *prima facie*, at least, by connecting himself with the deed of conveyance of William P. Haymond, commissioner of delinquent and forfeited lands. It was given, I suppose, for the reason that the evidence of possession for ten years under color of title on the part of the Wood heirs was very slight, in the opinion of the court; or, more likely, because no qualification was asked on the part of plaintiff.

"No. 4. If the plaintiff, or any one claiming title under which they (it) claim, or who should have been charged with taxes on the land, failed, for five successive years, to have the same entered on the books for taxation, then the title thereto was forfeited, and the jury should find for the defendant." This was properly refused, for several reasons : *First*, the foundation of plaintiff's title, its connection with and beginning from the commonwealth, was the fact that the John Ligney tract of ten thousand acres was, under the act of 27th February, 1835, forfeited, and vested in the commonwealth, because of omissions from the commissioner's land-books of the county; which forfeiture became absolute and complete on the 1st November, 1836 ; and so the commissioner, by his inquest, ascertained it to be, and so reported to court, as recited in its order of 12th April, 1842. Defendant's counsel had in his mind, no doubt, section 6, art. 13, Const. See Code (Ed. 1891) p. 51. That relates to the omission of any tract containing one thousand acres or more, for any five successive years after the year 1869. Lands, as they are sold, are constantly changing as to the name in which they are entered and charged on the land books ; and by formation of a new county, as in this case, passing from the land-books of the old county to those

of the new ; or part of it may lie in one county and part in another. This instruction was properly refused, because too indefinite as to location of the five successive years of omission.

"No. 5. If the jury believe that John B. Howell, by writing defining the boundary of the land claimed by defendant, sold to Samuel Cutlip said land, and that said Cutlip took possession thereof, and that he and those claiming under him held the same continuously since then, for ten years before the institution of this suit, no difference whether said title was good or bad, the defendant is entitled to hold said land." This instruction was properly refused, because there is before this court no proper evidence of such writing. The writing must be certified, so as to speak for itself on so important a matter, or its absence accounted for. It is generally true that such a writing is a sufficient color of title, as a basis of adverse possession, no matter whether such title be good or bad, so it defines the extent and character of the party's claim of ownership. But this case suggests that the character and nature of the origin of such an obscure color of title is not universally a matter wholly indifferent. But this point need not be considered. There is no evidence when, where, or how Samuel Cutlip had a visible mark of ownership on this two hundred acre-tract bounded by natural calls, which the surveyor, Mollahan, under the order, runs off, for the first time giving courses and distances of lines and corners, and as containing one thousand and seventy acres. He returns with his report, and as designated on his map, one, and one only, visible mark of ownership within the lines of this "natural boundary" of two hundred acres; and that is wholly on and within the lines of the "Walter Cool" grant of fifty acres, claimed to be owned by defendant's wife as her land; and this tract, as containing sixty five acres, the jury, by metes and bounds given, expressly find for defendant, being the land described in plaintiff's second count.

"No. 6. The actual possession of a part of a tract of land gives constructive possession of the whole, to the extent of the boundary defined in the title paper under which he claims ; and the actual possession of one tract gives con-

structive possession of an adjoining tract claimed by the same party, to the extent of the paper or color under which he claims such adjoining tract; and if such possession is continued uninterruptedly for ten years, whether by the same individual or by different individuals claiming under the same color, it perfects the title to the land so held." This was refused.

Several contiguous tracts, held by the same person in the same right, are often treated as one tract for many purposes; especially for purposes of agriculture, grazing, *etc.* Our farms are often, generally in fact, so made up and held. I see no reason why the doctrine of adversary possession, as laid down in this State, should not be applied to several contiguous tracts so treated and held as one, in the absence of some countervailing and controlling fact. So that for the purpose, and within the meaning, of the doctrine of adversary possession, as understood in this State, the real or apparent owner dwelling on his farm is as truly in the actual possession of the woodland and unimproved and uninclosed contiguous tract as of the adjoining pastures, fields, and garden; and this doctrine is applied liberally as to quantity and extent, yet treating it as made up of parts, as regards visible marks of ownership. We see, at a glance, a difference in many cases, especially in a new country. The dwelling house, the garden, and inclosed or improved land generally, we see at once bears the impress of use, and the visible marks of ownership and dominion, fencing in his own stock, and fencing out that of others. In order to discuss it intelligently, we may call this visible mark of ownership actual possession proper. Of a distant unimproved tract, not contiguous, on which he has no visible mark of dominion, his title may give him constructive possession proper; but, if contiguous to his home tract, then he has of it constructive actual possession; which, as well as actual possession proper, is actual possession, within the meaning of adversary possession in reference to the statutory bar, on the ground that actual possession of a part is actual possession of the whole, there being nothing to qualify or countervail such constructive actual possession.

When we come to apply this doctrine to this case, we

have no evidence tending in any degree to show that defendant has, or those under whom he claims had, any visible mark of ownership on this invisible color of title called the "one thousand and seventy acre-tract," except that it includes the improvement on his wife's fifty-acre tract. We are not told when or how, or by what right, the wife obtained her claim to the fifty acres. If it came to her since the 1st day of April, 1869, then it is her sole and separate estate, which is hers as if she were a single woman, in no way subject to the control of her husband, nor liable for his debts; and the husband only becomes tenant by the curtesy in the same, after her death. See section 15, c. 65, Code (1891). So that, whatever defendant's claim may be of the two tracts, the actual possession proper of a part or all of his wife's lands does not, in and of itself, give him constructive actual possession of his own contiguous tract. Therefore the instruction, even if correct, was abstract, and for that reason alone properly refused.

"No. 7. It makes no difference that there should be more land embraced in the boundary than the writing calls for; possession under the writing, with boundaries defined, whether by course and distance or by natural boundaries continued for ten years uninterrupted, perfects the title to all the land embraced within the boundary." It is generally true that the actual possession of the adverse claimant, provided it be exclusive, is not restrained to his inclosure, but is co extensive with the boundaries of his colorable title, and this, no matter how much the number of acres in fact may exceed the number called for; but the instruction was wholly abstract, and it was not error to refuse to give it.

"No. 8. If the jury believe from the evidence that there was a delinquency of the land claimed by plaintiff for any year or years, then the burden is on the plaintiff to prove the payment of taxes for said year or years." As the law was west of the Alleghenies, in actions of ejectment and writs of right, prior to July 1, 1850, proof of payment of taxes by plaintiff was a *sine qua non* to his right to recover as a general rule prescribed by statute. See section 17,

Acts 1st April, 1831, and section 3, Acts 23d March, 1836; Harlow, Land Laws, p. 47. But such has not been the law since the 1st day of July, 1850, unless the payment of taxes was made a distinct element of plaintiff's title, as it was where certain junior grantees were given the benefit of a forfeited title. See Acts 1st April, 1831, § 8; section 3, Act 27th Feb., 1835; and especially section 3, Act 22d March, 1842—as first dispensing with actual possession as one of the elements. See Harlow, Land Laws, p. 65. Therefore No. 8, asked for by defendant, was properly refused, and plaintiff's No. 1 properly given in lieu thereof, viz.: "The Court instructs the jury that a delinquency of lands for a less number of years than five consecutive years, unless something more should be shown, would not be a forfeiture of the title."

So far as relates to the four tracts within the outside boundary of plaintiff's tract, excluded from the operation of the deed to it, they are also excluded in his declaration, and are not sued for; and, if defendant had wished to avail himself of this, it was his place to show that some of the land for which he was sued was covered by one or more of these exceptions. I take it there was no such question, as the surveyor makes no mention of any such fact in his report, or any reference to it on his map. The bill of exceptions does not pretend to set out all the facts or all the evidence, only a very scant tendency of evidence, intended, I suppose, solely to show that the instructions asked were not abstract.

In conclusion: The jury in this case returned a verdict for defendant on the second count, giving him expressly, by metes and bounds and lines and corners, the fifty acres claimed by defendant's wife to its full extent. They saw the witnesses and heard them testify. It is their province to judge of the credibility of the witnesses and the weight of their testimony. The learned judge who presided instructed for defendant to the full extent to which he was entitled, without going into abstract propositions of law. On the motion to set the verdict aside, if he had seen that there was a clear and decided preponderance of evidence in such a case against the finding of the jury, or that they

were misled by partiality or prejudice, or there was from any cause a plain deviation from right and justice, or there had been any misruling in matter of substance on his own part to defendant's injury, we are to take for granted that he would have awarded a new trial. This verdict has passed through this ordeal to us. After close and searching scrutiny of the evidence and facts as they now appear and have to be regarded, and of the law as laid down and applied resulting in the judgment and verdict complained of, we are brought to the conclusion that substantial justice has been done, and no error committed other than a harmless one.

BRANNON, JUDGE (*Concurring.*)

I have never understood that a deed from the commissioner of delinquent and forfeited lands under the the Virginia forfeiture laws passed any title but that vested in the commonwealth by forfeiture. In *Smith* v. *Chapman*, 10 Gratt. 445, the effect of a sale under them was fully considered, and Judge LEE, who was particularly learned and experienced in land-law, on page 469 says the title passed is that vested in the commonwealth by forfeiture, whether of one or more titles, saying that, if forfeited under several titles, the whole was one title acquired by forfeiture, and that passed, his language not intimating that any further title passed.

The act of March 22, 1842, § 2, enacts that, if the commonwealth or literary fund has acquired title by forfeiture in different names, "all right, title, and interest which the commonwealth or literary fund may have acquired, or shall acquire, by any forfeiture of the same," shall vest in the first purchaser. When thus the statute itself gives a sale under a proceeding authorized only by statute, and, proceeding only against forfeited land because of forfeiture, declares that the deed shall pass only title by forfeiture, how can you give it effect to pass also the public right to waste and unappropriated land?

In *Levasser* v. *Washburn*, 11 Gratt. 572, it was held that such conveyance passed the title vested in the commonwealth by forfeiture. It was also held that a patent for for -

feited land was void, as a patent was authorized for waste and unappropriated land, not forfeited land, and the only way of acquiring title to forfeited land was by sale under the statute, or where it was transferred by statute to certain persons. *Levasser* v. *Washburn, supra.* This was then changed by statute. So, by parity of reasoning, waste land could be only acquired by entry, survey, and grant. There was no authority to sell it under the statute authorizing sale of forfeited lands. The statute instituting proceedings in court to sell forfeited lands was, in terms, confined to such land, and the jurisdiction was a special one, born of the statute, and limited to forfeited land. *Twiggs* v. *Chevallie,* 4 W. Va. 463. The deed of the commissioner under a sale would not pass other title than by forfeiture on any idea of warranty by the commonwealth. *Hoge* v. *Currin,* 3 Gratt. 201; *Smith* v. *Chapman,* 10 Gratt. 469. I do not think this matter essential to the decision of the case, and I can concur, therefore, in the judgment.

Affirmed.