# CHARLESTON.

## STATE v. JACKSON.

Submitted November 15, 1904—Decided December 20, 1904.

1. TAX SALE.—*Forfeiture.—Evidence.*

A record of a proceeding to sell land as forfeited to the state for non-payment or non-entry for taxes, which condemns the land to sale as forfeited, in which it appears that a grant issued from the state to a certain person, and that by specific conveyances the land had come to the ownership of another person, is *prima facie* evidence against strangers to the record of the fact of forfeiture, and also that such grant issued to such person, and that title under it vested in the person in whose name it was condemned as forfeited.   (p. 569).

2. TAX SALE.—*Tax Deed as Evidence Against Strangers.*

Under section 29, chapter 31, Code 1899, a tax deed is conclusive evidence against strangers to the tax sale to show that such title as was sold as delinquent was vested in the person in whose name it was sold.   (p. 569).

3. TAX SALE.—*Commissioner of School Lands.—Redemption.*

In 1884, in a proceeding by a commissioner of school lands to sell forfeited land, a decree allowed the owner to redeem, and declared the land redeemed and released from forfeiture, and decreed that the owner should also occupy the attitude of a purchaser from the commissioner; such owner took, not only the title redeemed, but also any other title vested in the state at the time of the redemption.   (p. 569).

4. TAX SALE.—*Title Derived from Sale for Forfeiture.*

One purchasing land sold as forfeited in a proceeding under

ch. 105 of the Code 1899, holds a grant from the State, within
the meaning of section 3, Art. XIII, of the Constitution, so as
to take under that section the benefit of another forfeited title.
(p. 571).

5.  TAX SALE.—*Forfeited Titles.*
    Section 19, chapter 105, Code 1891, giving all the State's title
to forfeited land redeemed or purchased, makes a legislative
grant from the state, within the meaning of section 3, Art.
XIII, of the Constitution, to enable a person coming within that
statute to take forfeited titles under that section of the Consti-
tution.   (p. 571).

6.  FORFEITED LAND.—*Constitution.*—*Payment of Taxes.*
    One who seeks to get the benefit of a forfeited title to land
under Art. XIII, section 3, of the Constitution, must prove the
payment of taxes as therein required.   (p. 572).

7.  FORFEITED LAND.—*Redemption.*
    One asking to make redemption of forfeited land under sec-
tion 17, Code 1899, chapter 105, must prove that at the time
when his land became vested in the state he held a good and
valid title, legal or equitable, superior to that of any other
claimant, whether that claimant be the state holding a superior
title by forfeiture or otherwise or an individual.   (p. 572).

8.  FORFEITED LAND.—*Estoppel.*—*When State Estopped from Selling.*
    When land has been once sold as forfeited under a proceed-
ing under ch. 105 of the Code to sell forfeited land, the state
cannot, in a later proceeding under that chapter, again sell the
same land as forfeited under another title.   The record of the
first sale is an estoppel against the state, preventing such sec-
ond sale.   (p. 572)

9.  TAX SALE.—*Redemption.*—*Duty of Owner in Redemption.*
    When in a proceeding to sell land as forfeited there is a de-
cree of redemption with a saving clause as to those tracts pro-
tected from the effect of redemption by section 3, Art. XIII, of
the Constitution, the person redeeming, when his redemption
comes in question, is not called on to prove the location of the
tracts so protected before he can avail himself of his redemp-
tion.   (p. 572).

10. TAX SALE.—*Redemption.*
    In a proceeding under chapter 105 of the Code to sell for-
feited land a decree allowing redemption by payment of taxes is
*prima facie* evidence of redemption as to third parties, and
cannot be collaterally attacked for error on account of the
sum paid to redeem being less than the amount really due the
state.   (p. 573).

11. TAXES.—*Presumption of Payment.*

There is no presumption of payment of taxes arising simply from the duty of payment.   (p. 575).

12. TAX SALE.—*Senior and Junior Titles.—Title Purchased at Tax Sale.*

If a senior title to land is forfeited, and then transferred by section 3, Art. XIII, of the Constitution, to the owner of a junior title and the junior title itself afterwards becomes forfeited, a sale by the state, in proceedings under chapter 105 of the Code to sell the land as forfeited under the senior title, will pass to the purchaser both titles.   (p. 575).

13. FORFEITED LAND.—*Forfeiture.—Constitution.*

Forfeited land cannot be redeemed from forfeiture if already the state's title by such forfeiture has been transferred to another title under section 3, Art. XIII, of the Constitution.   (p. 576).

14. TAX SALE.—*Title.—Constitution.*

The state cannot sell land that is forfeited by a suit under chapter 105 of the Code, if the title has already been transferred to a claimant by operation of section 3, Art. XIII, of the Constitution.   (p. 576).

15. FORFEITED LAND.—*Jury Trial.—Issue Out of Chancery.*

Trial by jury is a matter of right under Code, chapter 105, section 18, in a proceeding by the state to sell forfeited land, when conflicting titles to land are to be tried, if there is a controversy of fact dependent on oral evidence, but not where there is no controversy of fact, or where that controversy depends entirely on documentary evidence.   (pp. 576, 577).

Appeal from Circuit Court, McDowell County.

Bill by the state against Jane Jackson and others.   Decree for defendants, and the state appeals.

*Affirmed.*

HERNDON & SMITH, VINSON & THOMPSON, T. L. HENRITZ, and A. BURLEW, for the State.

RUCKER, ANDERSON & HUGHES, J. L. HAMIL, PRICE, SMITH & SPILMAN, MOLLOHAN, McCLINTIC & MATHEWS, A. W. REYNOLDS, and J. S. CLARK, for appellees.

BRANNON, JUDGE:

The State of West Virginia filed a bill in chancery in the circuit court of McDowell county in 1899 against Jane Jackson

and others, stating that on 1st March, 1860, the Commonwealth
of Virginia issued to Joseph Jackson and John C. Harrison,
Jr., a grant for four thousand six hundred and ten acres of land,
and that it had been omitted from the land tax books for more
than five years since 1869, and that it had thus become for-
feited and vested in the state, and prayed that said tract be
sold as forfeited land. W. M. Ritter filed a petition asking to
be admitted as a party defendant in the case, and he was ad-
mitted as such. Ritter's petition set up that the tract of four
thousand six hundred and ten acres was not vested in the state,
but that he was the owner of it by good and valid title superior
to the claim of the state and every other claimant thereto, and
that said land was not subject to sale as forfeited land vested
in the state, and the petition resisted such sale at the instance
of the state. Ritter's petition states that the said tract of four
thousand six hundred and ten acres lies wholly within a tract
of fifty thousand acres vested in Ritter by a chain of convey-
ances running back to the Commonwealth of Virginia. Rit-
ter's petition states that Virginia by patent, 4th March, 1795,
granted to Robert Morris a tract of 320,000 acres, and that
a specific portion of it, fifty thousand acres, had by convey-
ances specified in the petition come to the ownership of Ritter.
Ritter's petition further states that while Samuel Cameron was
owner of the fifty thousand acres, in 1869, it was sold for taxes
in his name and purchased by the state, and not redeemed, and
that it had ever since, up to the year 1885, been omitted from
the tax books, but was charged thereon for the year 1885 in
the name of Max Landsburg, who had become owner of said
fifty thousand acres under Cameron. Ritter's petition con-
tested the validity of the sale to the state in 1869 for some de-
fects in the tax sale proceedings, and avers that its omission
from the land books after 1869 did not forfeit it for non-entry
because of the state's purchase in '69. His petition stated that
Henry C. Auvil, commissioner of school lands, had, on 28th
July, 1882, filed a report and petition in the circuit court of
said county to the effect that the Morris tract of three hundred
and twenty thousand acres had been forfeited to the State for
omission to enter it on the tax books from 1866 to 1877, and
prayed that the whole tract be sold as forfeited and vested in
the state. Landsburg was a defendant to Auvil's petition and

filed an answer in 1882 asking to be allowed to redeem the tract of fifty thousand acres, he claiming the same, and on 6th April, 1883, a decree was made adjudicating that the title of Landsburg to the fifty thousand acres was superior to that of other claimants, except the junior claimants protected from the effect of redemption by law, and allowing Landsburg to redeem. In this proceeding upon Auvil's petition the court directed a large number of junior claimants to be summoned in to show their title, and referred the case to a commissioner to report upon their titles and to report what taxes they had paid on the land which they claimed. The Jackson-Harrison tract was not mentioned among these tracts claimed by junior claimants, nor was any owner of it made a party. A decree later recited that it was impracticable to pass on the rights of so many claimants, and dismissed them without decision of their rights, but protecting their rights from the effect of the proceeding. On 8th July, 1884, a decree was made in the Auvil case which fixed the sum to be paid by Landsburg to redeem the fifty thousand acres at $2,200.62 after deducting taxes which had been paid by junior claimants, and the decree declared Landsburg entitled to redeem by the payment of that sum, and it condemned the fifty thousand acres as forfeited and liable to sale, and directed its sale on failure of Landsburg to pay within a fixed time. On 8th October, 1884, a decree was made in the Auvil case stating that Landsburg had paid the money required to effect a redemption, and with the consent of Auvil decreeing that in addition to the privilege to redeem given him by a former decree Landsburg be "allowed also to occupy the attitude of a purchaser of said fifty thousand acres from Auvil, Commissioner, for said sum * * * * * the court treating said fifty thousand acres as the excess of purchase money above taxes, damage, interest and costs." The decree "ordered that the title of the state to said fifty thousand acres (subject to the qualifications hereinafter stated) be and is hereby released to the said Landsburg; and the said tract of land is hereby fully exonerated and released from all forfeitures and former taxes whatsoever. But this order shall in no wise affect or impair the rights, titles and claims of any claimant within the boundary of said fifty thousand acres whose titles and claims are protected under the Constitution and laws of this state;

but the titles and claims of such claimants shall remain as valid as if this order had not been entered." Ritter's petition set up the said proceedings in the Auvil case and relied upon them as an adjudication preventing the state from claiming that the fifty thousand acres, which covered the Jackson-Harrison four thousand six hundred and ten acre tract, was forfeited and subject to sale, and relied upon the Auvil proceeding as operating to bar the State from claiming the land in any way. Ritter claimed that the State had no title to the four thousand six hundred and ten acres. Ritter's petition further states that a part of the fifty thousand acres had been sold from Lansburg by decree of the circuit court of the United States and conveyed under such sale to Henry McCormick; that all taxes had been paid on the land after the redemption in 1884, except that it was returned delinquent in the name of Landsburg for taxes of 1895, and sold in 1897 for such taxes, and had been conveyed under that tax sale to McCormick.

McCormick had conveyed the land to Ritter. Ritter claimed that when the Jackson-Harrison grant issued for the four thousand six hundred and ten acres the State of West Virginia could not confer any title by that grant, for the reason that said four thousand six hundred and ten acres was covered by the fifty thousand acres, which was part of the old Morris grant of 1795 of three hundred and twenty thousand acres.

. Ritter claimed that though the Jackson-Harrison grant passed no title, yet any title that might be supposed to arise from its forfeiture enured to the benefit of the owners of the fifty thousand acres by force of section 3, article XIII, of the Constitution, by reason of the owners of that land having paid taxes for five years after the year 1865, and that thus any shadow of title under the Jackson-Harrison grant was transferred to the owners of the fifty thousand acres, and did not belong to the State to be sold by it. Ritter claimed to own any shadow of title conferred by the Jackson-Harrison grant and denied the right of the State to sell it. The Jackson-Harrison land was assessed with taxes for 1865 to 1870 inclusive, and was delinquent for the last four of those years. It does not appear that the taxes for 1865 and 1866 were paid. From 1871 to 1879 inclusive half of the four thousand six hundred and ten acre tract of the Jackson and Harrison two thousand three hundred

and five acres, was charged on the tax books, and four times sold to the State for some of those years. This half was omitted from the tax books from 1880 to 1895 inclusive. It vested in the State four times by purchase for taxes, and later was forfeited for non-entry several times, viewed without regard to Ritter's rights. In November, 1876, it became irredeemable and vested in the State as tax purchaser, and if thereafter chargeable with taxes, it vested in the State for omission from the tax books not later than 1st January, 1885. The other half of the four thousand six hundred and ten acres was never on the tax books after 1870, and was several times forfeited for omission, the first forfeiture being complete 1st January, 1876. H. A. McCurdy, claiming the Jackson share of the four thousand six hundred and ten acres granted to Jackson and Harrison, filed an answer in the said suit of the *State* v. *Jane Jackson,* setting up his claim, admitting the forfeiture of the tract to the State, and asking to be allowed to redeem. W. R. Thompson and T. J. Prichard, as trustees, claiming the Harrison share of the four thousand six hundred and ten acres, filed their petition in the suit of the *State* v. *Jane Jackson,* admitting the forfeiture of said tract, and asking to be allowed to redeem. The petition charged that the sale to the State, in 1869 of the fifty thousand acres had vested it in the State, and alleged that taxes had been paid on the four thousand six hundred and ten acre tract from 1865 to 1870, and that by reason of such payment the State's title to the fifty thousand acres had been transferred to the owners of the four thousand six hundred and ten acres by the Constitution, Article XIII., section 3. Thompson and Prichard also filed their petition making practically the same defense as did McCurdy, and claiming that the fifty thousand acres was forfeited and that the forfeited title vested in the owners of the Jackson-Harrison land. Thus, the State claimed the four thousand six hundred and ten acre tract by forfeiture and sought to sell it; and Ritter claimed that the State had once sold this same land to Lansburg under the forfeiture of the Morris title, and that he owned the four thousand six hundred and ten acres because by forfeiture it was vested in the State, and that the title to it had been transferred from the State to the owners of the fifty thousand acres; and McCurdy and Thompson and Prichard claimed the four thousand

six hundred and ten acres, and also title to its extent under the Morris grant because of its forfeiture and enurement or transfer by the Constitution to the owners of the Jackson-Harrison grant.

Ritter resisted the redemption of the four thousand six hundred and ten acres. It is a title contest between the State and Ritter, and between the State and McCurdy and Thompson and Prichard, and between Ritter on the one side and McCurdy and Thompson and Prichard on the other.

The court referred the case to a commissioner to report whether the four thousand six hundred and ten acres was forfeited, and in whose name, and if forfeited in whom the title was at the date of the forfeiture, and what person was entitled to redeem, and any other pertinent matter. The commissioner's report found that on 4th March, 1795, a grant issued to Morris for three hundred and twenty thousand acres, and that by regular conveyances fifty thousand acres of it had been passed to Ritter, and that the four thousand six hundred and ten acres was within the fifty thousand acres, and that no evidence had been adduced to show that when the grant to Jackson and Harrison issued the fifty thousand acres had been forfeited, and that when that grant issued there was no title in the State to pass by it to Jackson and Harrison, and that the grant conferred no title on them. Said report found that the four thousand six hundred and ten acre tract had been assessed with taxes for 1867 to 1870 inclusive, and was delinquent for those years; that half of it was assessed with taxes from 1871 to 1880 inclusive, and it was sold in 1875, 1877, and 1879, and that in 1881 it was sold for the taxes of 1879, and purchased by the State at all the sales; that in 1897 the whole tract was sold to the State for taxes of 1896; that this half became irredeemable and vested in the State by reason of the first tax sale in November, 1876, and it was thereafter properly omitted from the tax books, because vested in the State by purchase for taxes. The report found that the other half of said four thousand six hundred and ten acres was omitted from the tax books from 1871 to 1896.

The report found that the whole tract was by said tax purchase by the State of one-half, and such non-entry of the other half, vested in the State. It found that the whole tract had

vested in the State. The report found that on 8th October, 1884, in the proceeding in the name of *Auvil, Commissioner of School Land,* v. *Landsburg,* Landsburg had redeemed said fifty thousand acres from any forfeiture accruing prior to that date, and had paid the taxes thereon subsequently. The report found that no taxes had ever been paid on the four thousand six hundred and ten acre tract, and that its owners could not, and did not, take the benefit of the forfeiture of the fifty thousand acres. The report was excepted to by McCurdy and Thompson and Prichard. One exception was because the report did not state that the four thousand six hundred and ten acre tract was not assessed with taxes for the years 1865 and 1866.

Another was because the report found that half the four thousand six hundred and ten acres was sold in 1875 for the taxes of 1871, 1872 and 1873, as there was no evidence thereof. Other exceptions read as follows: "(5). The Commissioner erred in finding that W. M. Ritter had title to the whole of the 50,000 acre tract. (6). Commissioner erred in finding that Max Landsburg redeemed the whole of said 50,000 acre survey in 1885. (7). Commissioner erred in finding that W. M. Ritter was entitled to the whole of the 50,000 acre tract, including the four thousand six hundred and ten acres, and that the State had no right to proceed against it, for the benefit of the School Fund. (8). That Commissioner erred in finding that the claimants of the Jackson and Harrison grant were not entitled to redeem the land embraced in said grant and in finding that their title was not superior to that of any other claimant. (9). Because the Commissioner failed to state that he has certified up with the report all the evidence before him upon which the report is based." The Court made a decree dismissing the bill of the State, and refusing leave to McCurdy and Thompson and Prichard to redeem the tract of four thousand six hundred and ten acres, and they appealed to this Court.

As to the exception to the report for failing to state that the four thousand six hundred and ten acres was taxed for 1865 and 1866, it seems to be well taken, but it is immaterial, because payment of two years' taxes would not save it from default afterward, or transfer the forfeited Morris title to the Jackson-Harrison title. If paid for those two years, it would only be one years' payment after '65, whereas the Constitution requires five

successive years' payment after that year. And there is no evidence of any payment for either year.

As to the exception that the report found half of the four thousand six hundred and ten acres was sold in 1875. An abstract certified by the clerk of the county court proves the fact. As to that exception because the report found that Ritter had title to the whole fifty thousand acres, and that Ritter was entitled to it, including the four thousand six hundred and ten acres, and that the State had no right to proceed against it for the benefit of the School Fund. It is said that Ritter produced no grant from Virginia to Morris, and produced no title papers to show title in Ritter to the fifty thousand acres, part of the Morris grant, and that for want of documentary evidence the finding that Ritter was entitled to the fifty thousand acres is erroneous. This, of course, is an important matter in the case. Ritter's counsel seek to meet this objection by saying that Ritter's petition, read as an answer, states the existence of the documents, and that its statement is taken as true without proof, there being no replication to it, and cite *Snyder* v. *Martin,* 17 W. Va. 276. An answer is taken for true against a plaintiff in the absence of a replication; but the answer of one defendant is not thus taken for true against another defendant. Hogg Eq. Proced. sec. 447. But how do we know that there was not such evidence before the Commissioner? The presumption holds that there was. *Righter* v. *Riley,* 42 W. Va. 633. Counsel for Ritter meet this point by saying that no exception to the commissioner's report was made on this score, but that the matter is brought up in this Court for the first time, and that if this Court heeds it, it will work a surprise upon Ritter which ought not to be tolerated, because if it had been presented by the proper exception in the lower court, the objection would have been met by the production of the documents. I think this argument so far legitimate as to justify this Court in scrutinizing the exceptions closely to see whether, when properly construed, they gave fair warning to Ritter and the court of the want of such documentary evidence. *Stewart* v. *Stewart,* 40 W. Va. 65, tells us that exceptions are of the nature of special demurrer, and the party complaining of the report must point out the errors by his exception with reasonable certainty, so as to direct the mind of the court to them. Look at exceptions 5, 6, 7. Construe them in connection with the fact

that the appellants contend in this case that Landsburg in 1884 did not redeem the whole fifty thousand acres, but only a part thereof, basing this theory on the fact that he paid only the residue of taxes on it after deducting taxes paid by junior claimants and that this amounted to a redemption of only part. The answer of Thompson shows this. Look at the repeated use of the word "whole" in said exceptions, and we are compelled to think that those exceptions were not based on the want of documents to show Ritter's title, and did not call for them, and did not have them in mind, and that the exceptions did not fairly call the attention of any body to the want of them. They did not contest the evidence to prove Ritter's title, but only that he had redeemed only part of the tract. Therefore, as to this objection, said exceptions are abortive. *Righter* v. *Riley,* 42 W. Va. 633. But let us say that those exceptions did call the title evidence in question. We hold that the report finding title in Ritter is justified by the record. The record of the proceedings in the *Auvil Case* established that a grant did issue to Morris, and that that title had come to Landsburg, and was in him in 1884 at the date of his redemption, and that he became invested with that title both in the character of redeemer and purchaser. I do not forget that the appellants were not parties to that proceeding. I know that it is a rule very fixed that "An adjudication of a fact in one case is not evidence of the fact in another case against persons not parties to the former or in privity with them." *Chevallie* v. *Twiggs,* 4 W. Va. p. 476.

"No party can be estopped or in any way prejudiced by any judgment or decree, if the record shows on its face that he had no opportunity to be heard in opposition to the entry or decree." *McCoy* v. *McCoy,* 29 W. Va. 794. Under that rule we may be asked how we can say that against those claimants of the four thousand six hundred and ten acres that record proves that there was a Morris patent and that title under it went down to Landsburg. I answer that the cases settle that a proceeding to sell forfeited lands, in which the land is condemned to sale for forfeiture, is *prima facie* evidence of the fact of forfeiture. *Strader* v. *Goff,* 6 W. Va. 257; *Coal Co.* v. *Howell,* 36 *Id.* 489; *Hitchcock* v. *Rawson,* 14 Grat. 535 in opinion; *Smith* v. *Chapman,* 10 *Id.* 446. They show that such record can not be collaterally at-

tacked. Right or wrong, those cases give such proceedings such effect.

I see no reason why the record would not be evidence of redemption even as to strangers to it. It will be said, however, that those cases only establish *prima facie* the fact of *forfeiture,* and that they do not justify the finding from such a record that the Morris patent existed and that documents pass the title down the line from Morris to Landsburg. I reply that as the record establishes the fact of forfeiture we must inevitably say that something was forfeited, and looking at the record we find what that was, namely, a tract granted by patent to Morris. That is the matter stated in the petition of the Commissioner of School Land, and otherwise evinced in the record, and that is the subject on which the decree operates, and to which it relates. And that decree found and adjudged that conveyances had carried the Morris title to Landsburg, since it declared expressly that Landsburg owned the land derivatively from Morris by title superior to all others. Documents exhibited in this case show that part of the fifty thousand acres was sold from Landsburg to McCormick, and that the whole tract was sold for taxes in 1897 to McCormick and conveyed to him by a tax deed, and that McCormick conveyed the land to Ritter. The tax sale was in the name of Landsburg. By chapter 31, section 29, Code, that tax deed is made evidence to show against everybody that the material facts therein recited are true and that the title assessed passed to the purchaser. Landsburg is stated in that deed to have been assessed with taxes, and this deed passed his title. So, Ritter was properly reported as invested with the Morris title, so far as the documentary evidence is concerned .

What title do the decrees above mentioned made in the *Auvil Case* confer on Lansburg? They gave back to him, by force of the redemption, the Morris title to the fifty thousand acres; but at that time the Jackson-Harrison tract of four thousand six hundred and ten acres had become forfeited by reason of sales to the State and omission as above stated. Did the said decree of redemption confer upon Landsburg title to said four thousand six hundred and ten acres? A decree not merely allowed redemption to Landsburg of the Morris title and released the land under that title from all prior forfeiture, but it also allowed him to hold the character of purchaser of said fifty thousand acres,

as if he had purchased under the decree. I shall not say that a mere redemption under the Code 1887, chapter 105, section 14, would go further than simply to restore to the owner redeeming land his own title, and it may be that that feature of the decree according to Landsburg the character of a purchaser would not have any operation. True, it may be said under *Smith* v. *Chapman,* 10 Grat. 446, that that would be error only not liable to attack collaterally, and there is some force in this position; still, if there was no law to warrant such a provision I would hesitate to say that it would bind the claimants of the four thousand six hundred and ten acres. If Landsburg held the character, not only of a redeemer, but of a purchaser, he would get not merely the Morris title by redemption, but also any other title by forfeiture or otherwise vested in the State, including the Jackson-Harrison title, by the letter of section 15, of said Code, chapter 105. *Coal Co.* v. *Howell,* 36 W. Va. 489. The proceeding to sell forfeited land is statutory, and nothing can be done not warranted by the statute, and I repeat that I would doubt the intrinsic force of the provision in said decree alluded to to give Landsburg the character of a purchaser. *Chevallie* v. *Twiggs,* 4 W. Va. 463. But the question of the inherent effect of that clause of the decree is not all important, since Code, chapter 105, section 19, as found in chapter 94, Acts 1891, and edition of 1891 of the Code says: "And when in proceedings heretofore had under this chapter, for the sale of forfeited lands, the former owner shall be permitted to redeem or purchase the same from the forfeiture thereof by the payment of the taxes, interest, damages and costs due to the State thereon, and fixed and determined by the decree of the court in which such proceedings were pending, and has actually paid the same, or shall within one year after the passage of this act pay the same as required by such decree, such payment shall be valid and binding on the State, regardless of the irregularity of the proceeding or of any want of jurisdiction in the court to render such decree; and whatever right, title or interest the State may have had in such lands shall, by virtue of such decree and payment, be transferred to and be re-vested in such former owner." Was this provision made for this case expressly? At any rate it fits the case. It validates that feature of the decree of redemption according to Landsburg the character of a purchaser, carrying with it the effect of the decree

to pass to him all state title to that particular land, however derived, and besides making the decree have that effect the act itself is a legislative grant of all the state's right in that land to Landsburg. *Cecil* v. *Clark*, 44 W. Va. p. 676; *Wild* v. *Serpell*, 10 Grat. 405 (pt. 3). This retroactive feature as to redemption is omitted from the section as it reads in chapter 24, Acts 1893, Code, 1899, chapter 105, section 19, and section 17, gives redemption only the effect of re-investment of the former title; but the act of 1891 has had its effect, and was likely not unwise legislation, being intended to give a person paying all taxes demanded by the State under one title adverse titles vested in it, to give rest and peace among conflicting titles. So it is, the decree of redemption and purchase in that *Auvil Case* and that Act of 1891 gave, of their own force, title emanating from the state—made a grant, without calling on Ritter to show a grant to Morris or to connect with the Morris grant. *Coal Co.* v. *Howell*, 36 W. Va. 489, tells us that a purchaser under a decree selling forfeited land, or one tracing right from him, connects with the state; his purchase is a grant from the state. So is the grant made by the Act of 1891. Therefore, Landsburg had such grant as enabled him to take title under the Jackson-Harrison grant, by virtue of the Constitution, Art. XIII, section 3. That section provides for giving the state's title to three classes of persons, the second class being persons claiming under a grant from the State and paying taxes for five succesive years after 1865. When Landsburg redeemed he paid taxes for more than five years. This would give him the Jackson-Harrison title, which was then forfeited. And by payment afterward Landsburg would get that title, if afterward forfeited. Being a purchaser he would get all the state title by forfeiture or otherwise, by the Constitution and by section 12, chapter 105, of the Code, as found in chapter 95, Acts, 1882, and Code of 1887, in force at the time of Landsburg's redemption, and as that section still is. Thus, Landsburg got the Jackson-Harrison title both by statute and Constitution under that decree.

As to the contention that the order of redemption excepted junior claims, and that the Jackson-Harrison is a junior claim, and that the redemption does not effect it, it is only necessary to say that that land was not before the court in the proceeding among the junior claims represented by parties to it, and further

that the order excepted from the effect of the redemption only those junior claims which had paid taxes for five years after 1865, so as to have the benefit of the forfeiture. This could not save the Jackson-Harrison title. It had not paid any taxes. It follows from what is said above that McCurdy and Thompson and Prichard, claiming under the Jackson-Harrison grant, had no right to redeem.

The statute touching redemption demands that the person asking it shall prove that at the time of the forfeiture of his title "he had a good and valid title, legal and equitable, superior to that of any other claimant," because the intent was to drown the inferior title and not let it be redeemed to foment litigation with a superior title, whether in the state by forfeiture or in private ownership. This Jackson-Harrison claim could not answer this demand, because there was the older Morris title in Landsburg. And if it was in the state, not yet redeemed, it would be not dead, but a living superior title. That the state held the title makes no difference as to an inferior title asking redemption. Moreover, in connection with Landsburg's redemption and purchase, I will add that by chapter 105, of the Code of 1899, section 6, it is provided that "If at any time during the pendency of such suit, it shall appear to the court that any part of any tract of land in question therein has been sold by the State in any proceeding for the sale of school lands, and the taxes regularly paid thereon since such sale, or is held by any person under Art. XIII, of the Constitution of this State, the bill, as to such part, shall be dismissed." Landsburg had purchased, paid subsequent taxes, and held the four thousand six hundred and ten acres under the Constitution. The statute would justify the dismissal of this suit without a sale, as the State had once sold this soil. I do not say that it would justify a refusal of redemption by one entitled to redeem.

It is claimed that the redemption in 1884 by Landsburg is void for the reason that the whole fifty thousand acres was not redeemed, but only twenty-six thousand acres, and that the part redeemed was not defined by a survey and plat as required by chapter 105, section 14, of the Code, and *State* v. *King,* 47 W. Va. 437. This argument rests on the fact that a great number of adverse claimants of parts of the Landsburg fifty thousand acres had been summoned into the case, but the court did not

try their rights, but dismissed them from the suit, and then ascertained what taxes Landsburg owed on the whole fifty thousand acres, adopting the process of charging him by acreage with taxes on so much as was not claimed by adverse claimants, deducting taxes paid by them, and by this process charged him with taxes on twenty-six thousand acres, and on payment decreed a redemption of, not merely twenty-six thousand acres, but of the whole fifty thousand acres, with the proviso that the redemption should not impair the title of any claimants protected under the Constitution. Now, this is nothing but a decree of redemption of the whole fifty thousand acres with only a saving clause in favor of claimants made by the statute and Constitution; it is not a redemption with specific exception; in letter and intent the decree is a redemption of the whole tract. If this decree is void, then any decree of redemption of a whole tract, containing such a saving clause simply restraining the decree from injuring other claimants, like a clause of "without prejudice," is void. It is not error-to make that proviso, as it only declares what section 17, of chapter 105, Code, declares. Very different was the *King Case* cited above, in which in express words only a *part* of the tract was redeemed by specification of quantity and that part in nowise defined. For these reasons the rule of *Stockdon* v. *Morris,* 39 W. Va. 432, cited by counsel, does not apply. That rule is that where there is an inclusive grant its owner suing in ejectment must prove that the defendant is not on reserved land. It therefore can not be successfully contended that Ritter must prove just what part was redeemed and what excepted.

It is argued that the redemption is invalid because the sum paid by Landsburg was too little. If there is error in this, how can strangers complain? Not even the State could now complain. In collateral proceedings strangers can not assail the decree for such error. *Hall* v. *Hall,* 12 W. Va. 1; *Smith* v. *Chapman,* 10 Grat. 445; *Cecil* v. *Clark,* 44 W. Va. 659. *Hall* v. *Swann,* 39 W. Va. 353, holds that a decree of redemption is final, and works a redemption though the amount paid is too small.

But it is claimed that as Landsburg's fifty thousand acres was sold for taxes in 1869 to the State, and was thereafter omitted from the tax books, and the tract thus vested in the State, and was forfeited, the title to it passed to the benefit of the Jackson-Harrison title under section 3, article XIII., of the Constitution.

Doubtless if before Landsburg's redemption and purchase the Jackson-Harrison title had become invested with Landsburg's title by reason of its forfeiture, Landsburg's redemption would be without effect. For Ritter it is contended, in answer to the claim that Landburg's title was transferred to the Jackson-Harrison title, that the tax sale in Landburg's name to the State in 1869 is void, and vested nothing in the State, because the sale list was not returned to the clerk's office within ten days, and because no note of its return was made in that office, and because the sheriff's affidavit was not signed by him, and because the affidavit was not sworn to. *McCalister* v. *Cottrill,* 24 W. Va. 173. As to forfeiture for omission after the purchase by the State, it is answered for Ritter that the law forbade the charge of any land after its purchase by the State, and that this would prevent the forfeiture for non-entry, and for this position counsel for Ritter rely on *Sayer* v. *Burkhart,* 29 C. C. A., 137, 85 Fed. 246. As these matters are being considered in another case before the Court, and are not necessary for the decision of this case, though pertinent to it, I pass them without discussion, for the reason that the Jackson-Harrison land clearly did not pay taxes for five years after 1865 so as to claim the benefit of the forfeiture of the fifty thousand acres, if forfeited it was. As stated above, the Jackson-Harrison land was charged from 1865 to 1870, inclusive, and returned delinquent for the last four of those years. Half of it was charged to Jackson for 1871 to 1879, inclusive, then omitted until 1896, and delinquent in 1872 to 1879, inclusive. The other half was omitted from 1871 to 1875, inclusive. So, it is clear that this land did not pay taxes to enable it to claim the enurement to it of Landsburg's land. It was purchased by the State in 1875 for taxes of 1872, 1873, 1874, and again for years subsequent to 1879. It is incumbent on one seeking to take the benefit of the forfeiture of another's land under any one of the three classes provided for in article XIII., section 3, of the Constitution, to establish facts which will bring him within one of those classes. He holds the affirmative; he is claiming title; he claims a grant created by the Constitution, and must prove the facts to give him that grant or transfer. It is claimed that the Jackson-Harrison title took the benefit of the forfeiture of the Landsburg land under the second and third class specified in the Constitution.

Under either class the claimant must prove payment of taxes for five years. It is argued that as to taxes from 1865 to 1870, no sale appears, and that the continuance of the land on the books from year to year within that period affords a presumption of payment. Why so? The land would continue on the books till sale, though delinquent for any year. It is said that as it does not appear that the land was sold for taxes for those years the presumption is that such taxes were paid, because section 6, chapter 31, Code 1868, says: "After such sale as in the succeeding section is mentioned, if any real estate be not sold as therein required, it shall be presumed that such taxes * * were paid." That presumption is raised merely to charge the sheriff in favor of the State, I think. At any rate, the record contains no list of sales for those years. If it did, and this land was not on it, that presumption would prevail; but in the absence of that list no such presumption holds. It is argued in this case, however, that because it is a tax-payer's duty to pay his taxes, the law assumes that he has paid them. Such a proposition is repelled, in this instance, by the delinquency appearing for four of those years. But the law raises no presumption of payment of taxes. "No presumption of payment arises from the duty of the property owner to make it." 27 Am. & Eng. Ency. L. (2d Ed.) 753. *Smith* v. *Tharp,* 17 W. Va. 221, sustains this position. For these reason the claim of the Jackson-Harrison title for the inurement to its benefit of the forfeiture of the Landsburg land must be refused. The Jackson-Harrison title never paid any taxes and was clearly itself forfeited, before Landsburg's redemption, and after it. It was forfeited again and again. Its forfeiture is admitted by appellants.

Again: Say, merely for argument, that the Jackson-Harrison title got the Landsburg title by transfer under the Constitution. The answers admit that half the Jackson-Harrison land was forfeited for omission from 1871 to 1875, and its forfeiture complete at the close of 1875; and the other half was sold to the State for taxes from 1871 to 1878, or some of those years, and forfeited for omission from 1880 to 1895, inclusive. Now, as the Landsburg title paid taxes before and after redemption, would it not get the forfeited Jackson-Harrison title as such purchaser?

The complaint of the appellants is that the court would not

allow them to redeem the Jackson-Harison land; but as above
shown when they asked the redemption, the Jackson-Harrison
title had been transferred, because of its forfeiture, to the Morris·
and Landsburg title, and there was no title in the State for ap-
pellants to redeem, as their title was gone.  The State had, by
Landsburg's redemption, coupled with said statute of 1891 and
section 3, article XIII. of the Constitution, made grants of it
to the owners of the Landsburg title.  *Non dat qui non habet.*
*State* v. *Collins,* 48 W. Va. 64.  Besides that the very letter of
section 17, chapter 105, Code, 1899, demands that at the time
of forfeiture the redeemer have "good and valid title, legal or
equitable, superior to that of any other claimant." Even if at
that time the Landsburg title was forfeited and vested in the
State (it could not be vested in the owner of the Jackson-
Harison title), it was vital and instinct with life, an older and
better title in the State as proprietor, not extinct, though lost
to its original owners, to be granted out by the State to some one,
and the State would not allow a redemption of a title inferior
to its title, because it would thus be let loose to plague the su-
perior title.  The statute quoted above gives redemption only to·
the superior title.

After redemption Landsburg paid all taxes except for 1895.
For that year's taxes the Landsburg land was sold in 1897 in the·
name of Cameron, then its owner, and purchased by McCormick,
and if the Jackson-Harrison land was not then vested in the
State, it went to McCormick by virtue of his tax purchase, as
the Jackson-Harrison land was not on the tax books for 1895, and
McCormick would get not only the title sold, but any other not
on the books.

Great complaint is made by the appellants from the fact that
a demand for a jury was not granted by the court, which action
is said to be error by reason of section 18, chapter 105, Code,
which reads thus: "In every such suit brought under the pro-
vision of this chapter, the court shall have full jurisdiction,
power and authority to hear, try and determine all questions of
title, possession and boundary which may arise therein, as well
as any and all conflicting claims whatever to the real estate in
question arising therein; and the court, in its discretion, may at
any time, regardless of evidence, if any, already taken therein,
direct an issue to be made up and tried at its bar as to any ques-

tion, matter or thing arising therein, which, in the opinion of the court, is proper to be tried by jury. And every such issue shall be proceeded in, and the trial thereto shall be governed by the law and practice applicable to the trial of an issue out of chancery; and the court may grant new trials therein as in other cases tried by a jury." The language of that section is strong to import that a jury right under it is not matter of right, but of sound discretion merely, like an issue out of chancery. The right to an issue out of chancery is different from the jury right in a court of common law. The former is a matter of discretion only, sound discretion, and it requires a clear case of abuse of discretion to reverse the decree for refusal to direct such issue, because it is only to help the chancellor decide on conflicting evidence, where he plainly needs it. *Setzer* v. *Beale,* 19 W. Va. 289. But the jury right in common law procedure is under a guaranty of the Constitution preserving it in certain cases. I understand the jury right accorded by this statute to be the common law jury right. It is true that it is in a chancery suit, and in matters purely of equity cognizance and jurisdiction, the jury right does not exist, and this presents the question of the character of a suit by the State to sell its forfeited lands, under chapter 105, Code 1899. Many parties are before the court with their various titles. Is such a suit in its nature so far an equity suit as to make the jury given by the statute in question a mere discretionary issue out of chancery, or is it a chancery suit born first of this statute, not of purely equitable jurisdiction? It was unknown to equity jurisdiction before the statute. Can we call it a chancery suit to enforce a lien for taxes? No. It is not a lien which the State enforces. After forfeiture she has no lien for taxes, but owns the very land. It is a suit originated by the statute as a process adopted by the State for disposal of such land. Therefore, the principle applies that if a matter involved in the suit is of such nature as by common law would entitle the party to a jury, the Legislature can not, by merely making it triable in equity, rob the party of his jury right. To make such an act constitutional, that right must be in some way preserved.

If, when such matter is first brought within the jurisdiction of a court of equity the Constitution gives a jury in such matter, this rule prevails. *Davis* v. *Settle,* 43 W. Va. 17 (pt. 6); *Cecil* v. *Clark,* 44 *Id.* 659 (pt. 2); *Black* v. *Jackson,* 177 U. S. 349;

6 Am. & Eng. Ency. L. (2d Ed.) 974-76. Any suit by which legal rights are settled upon matters of fact are within this rule, whatever its form. *Barlow* v. *Daniels,* 25 W. Va. 515. An inspection of Code chapter 105, sections 6, 8, 18, will tell us that the proceedure in suits under it tries contesting adversary titles to land, to the extent necessary to reach the decree contemplated by the chapter. No instance of litigation can be suggested that is more distinctly of a legal nature proper for a jury than trial of competing titles to land. The party is, by the Constitution, entitled to it. When the statute originating suits of this character was enacted the jury right was already in the Constitution. It will not do to say that when equity has jurisdiction for one purpose, it will try all matters to give full relief. It will, if it have jurisdiction of a matter of purely equity cognizance; but this is not such a suit; it is a suit born of the statute, a new function given to an equity court, involving trial of land titles. I think, in passing, that this jury right is satisfied by an issue out of chancery, and that a proper practice would be to direct such an issue, and proceed in it, as in other cases. The statute says so. We, therefore, hold that the jury right under this statute is mandatory, because if we do not so construe the statute, it would likely be unconstitutional. We must so construe it as to harmonize it with the Constitution. But this jury right is not an arbitrary one. It does not apply where there is no matter proper for a jury, no issue of fact. We must here remember the primary rule discriminating the functions of court and jury, which tests the jury right, expressed by the maxim: *"Ad quaestionem facti non respondent judices; ad quaestionem legis non respondent juratores"* (to a question of fact the judges do not answer; to a question of law the jurors do not answer). There must be an issue, and that of fact, for a jury trial. There is no issue or controversy of fact calling for a jury in this case. The whole case depends on documentary evidence, raising questions of law, not on oral evidence. The answers in a sense contest the Morris grant, and that Ritter was connected with it. That depends on written evidence. The answer averred the sale of the Morris title to the State for taxes in 1869, and omission thereafter. Ritter's petition did not deny this. It was not an issue in the case. If it had been an issue, it was triable by documents. The answer of Thompson and Prichard does

not deny Landsburg's redemption, but asserts that it was of only a part of the fifty thousand acres. This raised no issue of fact on oral evidence, but depended on a record, a matter for the court. The answers do aver that the Jackson-Harrison land was assessed from 1865 to 1870, inclusive, with taxes, and that they were paid. This was in controversy and proper for a jury; but it is settled by documents. Suppose, however, that this is not a good answer as to this point, then I say that an issue as to that matter would have been immaterial; if decided for apellants, it would not have called for a decree for them, but a decree must have gone for Ritter, on the same principle that calls for judgment for the other party, regardless of a verdict for his opponent, under the rule that when a verdict rests on an immaterial plea, judgment goes *non obstante veredicto*. The verdict has no effect. *Duval* v. *Malone,* 14 Grat. 24; 4 Minor's Inst. 1140. That allegation of the answer, by its own showing, was without force, if true, as it was not one calling for a jury, for the reason that the answer admits that one-half the Jackson-Harison land became forfeited in 1875 for omission and the other in 1884; so that even if the taxes from 1865 to 1870 had been paid, the title would have later gone to Landsburg, because of such forfeiture. Is possession relied on for any purpose under the Jackson-Harrison title? The appellants make no pretense of possession for longer than nine years, just before the suit. What could that avail? It would not give title under the first class taking forfeited title under section 3, article XIII., of the Constitution, requiring ten years possession and payment of five years' taxes, nor under the third class requiring possession for five years and payment of taxes for five years. That title paid no taxes. Possession is immaterial in this case. It was not in controversy in the case. It did not continue long enough, even as claimed by the appellants, to give good title by the statute of limitation against the State or the owners of the Morris title, and if it had so continued, the right acquired by possession would be lost because of omission from the tax books. A title acquired by possession, like any other, may be lost by omission from the tax books and forfeited. *Parkersburg Co.* v. *Schultz,* 43 W. Va. 470. Thus possession could not call for the jury.

Estopped: The question whether that record, which I have

called the record of redemption, in the Auvil proceeding consti-
tutes an estoppel against the State, has been much discussed in
the case.    I have already tried to show that the record is
*prima facie* evidence to show that there was a Morris grant, and
that title under it was vested in Landsburg, and that it was
forfeited, and that it was redeemed by Landsburg, and I will
add purchased by him, for reasons above given. · As to these
points no question of estoppel arises.    The record is evidence
of those things.    But the question does arise whether the State
of West Virginia is estopped by that record from again selling
that land covered by that redemption.    A State may be some-
times estopped by record.    *Cecil* v. *Clark,* 44 W. Va. 659.    The
State could not, in the face of that record, made by her own act,
deny that there was a Morris survey and that it was forfeited,
and that it was sold, or that in this case it was redeemed; but
this is immaterial, as she is not denying these facts.    But does
that record bar her present suit?    Does it bar her from again
selling under the Jackson-Harrison title the same land which
she allowed to be redeemed in that redemption proceeding?    Or-
dinarily she would not be so barred, because she makes no war-
ranty; her sale is only quit claim, or even not that.    But in this
particular case, although that redemption was at its date only a
redemption, giving back to Landsburg only his original title,
yet by the said act of 1891 as found in chapter 94, Acts 1891,
and Code of 1891, chapter 105, section 19, the State made that
redemption a purchase and made it operate to pass, "whatever
right, title or interest the State may have had in such lands."
And in section 6, chapter 105, Code 1899, it is provided that if
it appear in a suit to sell forfeited lands that part of the land
in question has been before sold by the State as forfeited, the
suit as to the land before sold shall be dismissed.    Now, clearly
these statutes would bar the State from selling this land under
the Jackson-Harrison title and command a dismissal of the suit.
And the Jackson-Harrison land was vested in the State at the
date of that redemption and purchase by Landsburg, and under
chapter 105, section 12, Code 1887, and the principles stated in
*Coal Co.* v. *Howell,* 36 W. Va. 489, that redemption and sale
made the State sell to Landsburg, not only the Morris title, but
its ownership in the Jackson-Harrison land.

   As to the exception that the Commissioner failed to state that

he had certified all the evidence on which he acted. It is to be presumed that he did so. Documents and some depositions appear. Shall we reverse because he failed to certify that such evidence was all that was before him, when there is not the least showing that he failed to certify some part of the evidence? If such was the fact, the exceptor should have shown it, and asked a rule upon the Commissioner to compel its pro- duction.

Therefore, we conclude that as to the State the court properly dismissed the bill without a sale, and properly refused a redemp- tion of the Jackson-Harrison land, because Ritter owned it, and there was no title in its former owner to warrant a redemption. Therefore, we affirm the decree.

*Affirmed.*